**Affirmed and Opinion filed February 28, 2017.**



In The

# Fourteenth Court of Appeals

NO. 14-15-00574-CV

**WESTVIEW DRIVE INVESTMENTS, LLC AND JACK YETIV, Appellants**

**V.**

**LANDMARK AMERICAN INSURANCE CO. AND KING-PHILLIPS INSURANCE AGENCY, INC. AKA INSURTRUST INSURANCE, Appellees**

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2012-47829**

## O P I N I O N

In this insurance-coverage dispute, apartment-complex owner and former mortgagee Westview Drive Investments, LLC appeals from the take-nothing judgment rendered after a jury trial on its claims against King-Phillips Insurance Agency, Inc. for negligent misrepresentation, promissory estoppel, fraud, violations of the Deceptive Trade Practices–Consumer Protection Act ("DTPA"), and Chapter 541 of the Texas Insurance Code, and Westview's claims against

insurer Landmark American Insurance Co. for breach of contract, fraud, and deceptive trade practices. Westview's principal and attorney Jack Yetiv appeals from the three sanctions orders rendered against him for emailing Landmark's attorney Bruce Wilkin during the trial and threatening to file a grievance against him if Wilkin did not make certain statements in open court.

We overrule Westview's challenges to the (a) partial summary judgment against it on the scope of coverage, (b) directed verdict against it on limitations grounds on its claims against King-Phillips for negligent misrepresentation and for violations of the DTPA and Chapter 541 of the Texas Insurance Code, and (c) trial court's evidentiary rulings. We also overrule Westview's complaints of charge error and its complaints that, contrary to the jury's verdict, the great weight of the evidence establishes that Landmark breached the policy; that King-Phillips had apparent authority to act for Landmark; that King-Phillips is liable to Westview under a theory of promissory estoppel; that Landmark and King-Phillips defrauded Westview; and that Landmark engaged in unfair or deceptive acts or practices. Finally, we conclude that the trial court did not abuse its discretion in sanctioning Yetiv. We accordingly affirm the trial court's judgment.

## I. BACKGROUND

In early 2008, a group of companies affiliated with Texas Tomic Sharma Family LP owned four apartment complexes: Westview Forest Apartments, Kingsgate Village Apartments, and two others. Each apartment complex appears to have been owned by a different company. TTSF LP #5 ("TTSF") owned Westview Forest Apartments, and the property was the security for a note owned by FirstVal 1, Ltd. Despite the different ownership of the four apartment complexes, all of them were covered under the same insurance policy issued by Landmark American Insurance Company, which had been obtained by retail

insurance broker King-Phillips Insurance Agency, Inc. from a wholesale insurance broker.

As the mortgagee of Westview Forest Apartments, FirstVal required proof that the property was insured, so in February 2008, King-Phillips gave FirstVal a document referred to as an "EPI" for "Evidence of Property Insurance." The EPI identified Landmark and Westchester Surplus Lines as the companies issuing the insurance; TTSF as the named insured; and Westview Forest Apartments as the insured property. Under the heading "Additional Interest," the EPI lists FirstVal, and FirstVal's interest is identified as "Mortgagee." Although FirstVal also owned a note secured by the Kingsgate Village Apartments, the EPI at issue in this case concerns only the Westview Forest Apartments.

## A.    Westview's Acquisition of the Note and the Property

Shortly after FirstVal received the EPI, TTSF filed for bankruptcy protection. With the approval of the bankruptcy trustee, FirstVal sold the note on Westview Forest Apartments to Westview Drive Investments, LLC ("Westview") in late September of 2008. Jack Yetiv, president of Westview's corporate managing member, signed the note on Westview's behalf. As part of the sale, FirstVal assigned the EPI to Westview. On October 7, 2008, Westview foreclosed on the note and purchased the apartment complex.

## B.    Pre-claim Discussions of Insurance Coverage

Beginning at around the same time as the foreclosure, King-Phillips's agent Greg McGehee began speaking with FirstVal's Dwayne Young, Yetiv, and Yetiv's attorney John Quinlan about an unpaid premium on the Landmark policy covering both the Westview Forest Apartments and the Kingsgate Village Apartments. To continue the coverage then in effect, Yetiv agreed with Young that FirstVal would

pay the premium-finance company the portion of the premium allocable to the Westview Forest and Kingsgate Village Apartments, and Westview would reimburse FirstVal for Westview's share. Regarding the coverage that would be afforded to Westview under the policy, Quinlan emailed Yetiv that he thought the carrier needed to agree to change the named insured. After FirstVal made the premium payment, Yetiv forwarded Quinlan's email to Young and asked if the insurer or agent would commit to provide an EPI naming Westview as an insured. Young forwarded the email chain to McGehee and asked McGehee to address those concerns. McGehee responded to Young that he did not know the answer, and asked Young to forward his response "to all parties concerned." Five days later, McGehee emailed Young that he still did not have a final answer.

On November 5, 2008, a fire destroyed the Westview Forest Apartments' leasing office. Yetiv did not report the fire, but continued to request evidence that Westview had property coverage under the Landmark policy. On November 13, 2008, McGehee emailed Yetiv that a transfer of coverage was left to the carrier's discretion, and on December 5, 2008, King-Phillips wrote to Yetiv that it was unable to transfer TTSF's coverage to Westview. Six weeks later, Yetiv reported the fire to King-Phillips and filed a claim on Westview's behalf.

## C. Post-claim Discussions of Insurance Coverage

Westview sought insurance proceeds to cover the replacement of the building and its contents, and the loss of accounts receivable, valuable papers, business income, Westview's business personal property, and Yetiv's business personal property that was kept at the apartment complex's leasing office. Landmark informed Westview that the policy afforded Westview only the coverage available to a mortgagee, which was limited to coverage for covered losses to buildings or structures. The policy defined "building" to include (1)

4

personal property used to maintain or service the building or its premises; and (2) materials, equipment, and supplies used for making additions, alterations, or repairs to the building. Landmark paid Westview more than $334,000 for these losses and to reimburse Westview for its emergency expenses to secure the building immediately after the fire.

Westview continued to assert that it was entitled to all of the coverage afforded to the named insured TTSF, and in addition, Westview made claims "on behalf of" TTSF. In response, Landmark pointed out that the policy limited coverage on TTSF's claims to the amount of TTSF's financial interest in the covered property. Landmark asked for evidence that TTSF's financial interest in the property survived the foreclosure, but none was ever produced.

## D.     The Claims Against Landmark and King-Phillips

In August 2012, Westview sued Landmark and King-Phillips.[1] Westview asserted a claim against Landmark for breach of contract and claims against both defendants for promissory estoppel, fraudulent inducement, negligent misrepresentation, violations of Chapter 541 of the Texas Insurance Code, and violations of the DTPA. Westview alleged that McGehee and King-Phillips had actual and apparent authority to act as Landmark's agents. With the exception of a breach-of-contract claim, all of Westview's complaints against Landmark were based on conduct by McGehee or King-Phillips as Landmark's alleged agents.

The trial court granted Landmark partial summary judgment holding that under the policy, Westview was a mortgageholder rather than a named insured, and that the policy did not provide coverage to a mortgageholder for business personal property, business income, accounts receivable, or valuable papers and records.

---

[1] Westview initially named Greg McGehee as an additional defendant, but McGehee is deceased.

The trial court also granted Westview partial summary judgment holding that under Texas Insurance Code section 4001.051, King-Phillips is Landmark's agent for the purpose of claims brought under Chapter 541 of the Texas Insurance Code. The trial court denied the motion as to any claims that the statute authorized King-Phillips or McGehee to alter any policy terms.

Before the case was submitted to the jury, the trial court granted King-Phillips's motion for directed verdict on Westview's DTPA, Insurance Code, and negligent-misrepresentation claims on limitations grounds. The jury was asked whether Landmark was liable for breach of contract, promissory estoppel, and unfair or deceptive acts or practices; whether King-Phillips acted with Landmark's apparent authority; and whether either defendant was liable for fraud. The jury answered each question in the negative.

### E.     The Sanctions Against Yetiv

At trial, Yetiv testified that he waited for over two months before reporting the fire because Westview's attorney Edward Rothberg agreed with him that it would be better to first obtain evidence of insurance coverage. Landmark and King-Phillips responded by serving Rothberg and Rothberg's former law firm with subpoenas duces tecum to discover Rothberg's communications with Yetiv about disclosing the fire. Westview moved to quash the subpoenas on the ground that the documents were protected by attorney-client privilege. In response, Landmark and King-Phillips argued that the documents fell within the crime-fraud exception to the privilege, and the trial court agreed.

After this ruling, Yetiv emailed Landmark's attorney Bruce Wilkin and threatened to present disciplinary charges against him and his firm unless by noon on the next business day Wilkin announced in open court that there was no factual or legal basis for the argument that the crime-fraud exception applied; apologized

6

for raising the argument; and withdrew it entirely. Wilkin did not do so, and after both sides rested, Landmark's lead counsel brought the email to the trial court's attention. The trial court ordered Yetiv to show cause why it should not sanction him under its inherent powers or "take appropriate action" under Canon 3(D) of the Texas Code of Judicial Conduct.

After the show-cause hearing, the trial court found that Yetiv violated Rule 4.04 of the Texas Disciplinary Rules of Professional Conduct. It ordered Yetiv to complete twelve hours of continuing education in ethics and ordered the clerk of the court to send the transcript of the show-cause hearing and certified copies of the exhibits and the court's orders to the Chief Disciplinary Counsel of the State Bar of Texas. In addition, the trial court sanctioned Yetiv under its inherent powers, ordering him to pay the defendants' attorneys' fees "incurred as a result of the proceedings arising from" the email. Yetiv did not controvert King-Phillips's evidence that it reasonably incurred $551 in attorney's fees, and the trial court ordered that amount paid directly to King-Phillips's lead counsel. Because Yetiv controverted the amount of Landmark's attorneys' fees, the trial court held another evidentiary hearing, after which it ordered Yetiv to pay Landmark's attorneys' fees of $4,378 into the registry of the court. The trial court then rendered the final judgment incorporating the partial summary judgments, the directed verdict, the jury's verdict, and the sanctions orders, and allowed Westview's motion for new trial on factual-sufficiency grounds to be overruled by operation of law.

## II. ISSUES PRESENTED

Westview challenges the trial court's rulings granting Landmark partial summary judgment on coverage issues; granting King-Phillips a directed verdict on Westview's DTPA, Insurance Code, and negligent-misrepresentation claims on limitations grounds; and excluding evidence that Landmark issued an endorsement

to the policy making FirstVal a named insured with respect to Kingsgate Village Apartments. Westview additionally raises several complaints of charge error, and challenges the factual sufficiency of the evidence to support each of the jury's answers pertaining to Westview's claims. Yetiv challenges the trial court's sanctions against him.

## III. WESTVIEW'S APPEAL

Because Westview is the primary appellant, we address its issues first.

## A. Summary Judgment Regarding the Scope of Coverage

A movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). We review a summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a traditional summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

### 1. *The policy's terms*

An insurance policy generally is governed by the same rules of construction that apply to other contracts. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113,

118 (Tex. 2015). As with any written contract, our primary concern is to identify the parties' intentions as expressed in the document. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We accordingly begin our analysis with the policy's language. *See JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 602 (Tex. 2015) ("In determining a question of insurance coverage, we look first to 'the language of the policy because we presume parties intend what the words of their contract say.'" (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (sub. op.))). We strive to harmonize the entire agreement, giving effect to all of the policy's words and provisions so that none are rendered meaningless. *Id.* at 603.

If the parties offer differing constructions of the policy but only one is reasonable, then the policy is unambiguous and we will adopt that construction. *See RSUI Indem. Co.*, 466 S.W.3d at 118. But if the policy's provisions are unclear or inconsistent, and after applying the pertinent rules of construction, more than one interpretation is reasonable, then the contract is ambiguous. *See, e.g.*, *J.M. Davidson, Inc.*, 128 S.W.3d at 229 (addressing contracts generally); *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990) (specifically addressing insurance policies). An ambiguous policy is construed against the insurer and in favor of coverage. *See, e.g.*, *Gonzalez*, 795 S.W.2d at 737; *RSUI Indem. Co.*, 466 S.W.3d at 118. Whether a contract is ambiguous is a question of law for the court to decide; the parties' mere disagreement about the contract's meaning does not create an ambiguity. *See In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015).

### a.     The policy's "named insured" coverage

Westview maintains that because it is the owner of the Westview Forest Apartments, the Landmark policy affords it the same "named insured" coverage

provided to the apartment complex's prior owner TTSF. But at all times from Westview's purchase of the note through the date of the fire, the policy listed as named insureds only TTSF and its affiliated companies having some interest in one or more of four apartment complexes.[2]

When Westview foreclosed on the property, it did not automatically acquire the same coverage afforded to TTSF. The policy states, "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured," and it defines "'you' and 'your' [to] refer to the Named Insured shown in the Declarations." It is undisputed that Landmark never consented in writing to the transfer of TTSF's rights under the policy to Westview. Thus, under the policy's unambiguous terms, Landmark did not provide Westview "named insured" coverage.

### b.      The policy's "mortgageholders" coverage

Another policy provision—the "mortgageholders" provision—affords lesser coverage to an entity other than the named insured. The scope of that coverage is shown by the provision's placement in the policy and by its terms.

The Landmark policy contains two "coverage parts," namely, commercial inland marine and commercial property. Each coverage part includes a variety of "coverage forms." The commercial inland marine coverage part includes "accounts receivable" and "valuable papers and records" coverage forms. The commercial property coverage part includes "business income" and "building and personal property" coverage forms. The "mortgageholders" provision is found only in the "building and personal property" coverage form.

---

[2] The other limited partnerships were Texas Tomic Sharma Family LP, TTSF LP #2, TTSF LP #6, and PTS Family Ltd. Partnership.

The mortgageholders provision states, "We will pay for covered loss of or damage to buildings and structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear." Under this unambiguous language, a mortgageholder has coverage for loss of or damage to Westview Forest Apartments' "buildings and structures," as that expression is used in the policy.

The declarations identify FirstVal as the mortgageholder on the Westview Forest and Kingsgate Village properties, and when FirstVal sold the note to Westview, Westview became the mortgageholder of the Westview Forest Apartments. Although the declarations page was not amended to add Westview, Landmark nevertheless honored FirstVal's assignment to Westview of FirstVal's interest in the policy as the mortgageholder of the Westview Forest Apartments. Landmark accordingly afforded Westview the coverage that the policy provided to a mortgageholder, that is, coverage for loss of or damage to Westview Forest Apartments' "buildings and structures."

### 2. Westview's arguments for broader coverage

Westview contends that the trial court erred in granting partial summary judgment holding that the policy provided coverage to Westview only as a mortgageholder. According to Westview, it is entitled to named-insured coverage because (a) it succeeded to FirstVal's rights under the policy's EPI and declarations; (b) TTSF assigned the policy and all other property to the mortgageholder, including insurance proceeds from its business-interruption, accounts-receivable, and valuable-papers coverage; (c) TTSF agreed to procure the insurance for the mortgageholder's benefit; and (d) Texas Insurance Code section 862.055 entitles a mortgageholder to collect fully on a fire-insurance policy if the named insured cannot do so. We discuss each argument in turn.

11

### a. A mortgageholder's coverage under the policy's EPI and declarations

The policy's coverage of FirstVal's interest in Westview Forest Apartments was transferred to Westview, but what was the scope of that coverage? According to Westview, the policy's EPI and declarations give a mortgageholder the same coverage as that afforded to a named insured.

Westview, however, has made mistaken assumptions about the terms used in these documents. The EPI concerning Westview Forest Apartments identified TTSF as the only "named insured" and identified FirstVal as an "additional interest." According to Westview, an "additional interest" is the same as an "additional named insured" or an "additional insured," and as such, an "additional interest" is entitled to the same coverage provided to the named insured. This is incorrect.

"Additional insured" and "additional named insured" are terms with well-established technical meanings in insurance policies. *See W. Indem. Ins. Co. v. Am. Physicians Ins. Exch.*, 950 S.W.2d 185, 188 (Tex. App.—Austin 1997, no writ). An "additional insured" is one whose status—such as that of an employee or a household member—places him within the policy's definition of "insured." *See id.* at 189. An "additional named insured" is one who is specifically identified as a named insured to an already-existing policy. *See id.* The EPI contained a box to be filled in with the identity of any "additional named insured(s),"[3] and tellingly, the box is empty.

Rather than characterizing FirstVal as an "insured," the EPI described FirstVal only as having an "additional interest." As used in this context, "interest" means "a stake, share, or involvement in an undertaking, esp. a financial one."

---

[3] Full capitalization omitted.

NEW OXFORD AMERICAN DICTIONARY 905 (Angus Stevenson & Christine Lindberg, eds., 3d ed. 2010). This definition describes FirstVal's interest as a mortgageholder because when the EPI was issued, FirstVal had a security interest in the insured property. FirstVal's financial interest as a mortgageholder is the only interest that it ever had in Westview Forest Apartments, and that is the only interest it assigned to Westview.

Westview's argument regarding the policy's declarations follows the same lines as its argument about the EPI, and fails for the same reason. When the fire occurred, the declarations identified only the TTSF companies as the named insureds,[4] and listed FirstVal only as "mortgage holder." Moreover, the declarations state, "In return for the payment of the premium, and *subject to all the terms of this policy*, we agree with [TTSF] to provide the insurance as stated in this policy."[5] Under the policy's terms, the coverage provided to mortgagees is specified in the mortgageholders provision, and that coverage is narrower than the coverage provided to the named insured.

### b. Coverage under TTSF's assignment of its policy to the mortgageholder

Westview next contends that if a mortgagor has assigned its policy to the mortgagee, then the mortgagee is entitled to collect all coverages included in the policy, including proceeds payable for business interruption, loss of accounts receivable, and loss of or damage to valuable papers. The only case it cites in support of this proposition is *Peacock Hospitality, Inc. v. Association Casualty Insurance Co.*, 419 S.W.3d 649, 652 (Tex. App.—San Antonio 2013, no pet.). We

---

[4] The EPI lists TTSF as the only named insured because it provides evidence of property insurance for only one property, namely, the Westview Forest Apartments. But the Landmark policy as a whole covers four properties, so the policy declarations include the named insureds for all four properties.

[5] Full capitalization omitted, emphasis added.

find no such holding in that case, which is factually distinguishable. *Peacock* did not involve demands for coverage for business interruption, accounts receivable, or valuable papers. The coverage dispute in *Peacock* concerned only the amount due for building repairs, and here, Landmark and Westview agreed on the amount to be paid to replace the leasing office. Further, Landmark's policy provided that the TTSF's rights could not be transferred without Landmark's written consent, which was never given.

### c. Coverage implied by TTSF's agreement to procure insurance for the mortgagee's benefit

Westview also contends that under Texas law, a mortgagee can collect on the mortgagor's insurance policy if the mortgagor agreed to procure insurance for the mortgagee's benefit. In support of this position, Westview cites several cases holding that if a security agreement requires the mortgagor to procure insurance for the mortgagee's benefit and the policy contains no such provision, then equity will imply its existence. *See, e.g.*, *Beneficial Standard Life Ins. Co. v. Trinity Nat'l Bank*, 763 S.W.2d 52, 55 (Tex. App.—Dallas 1988, writ denied) (op. on reh'g); *Cont'l Ins. Co. v. Stewart & Stevenson Servs., Inc.*, 306 S.W.2d 415, 420 (Tex. Civ. App.—Houston 1957, writ ref'd n.r.e.); *Fid. & Guar. Ins. Corp. v. Super-Cold Sw. Co.*, 225 S.W.2d 924, 927 (Tex. Civ. App.—Amarillo 1949, writ ref'd n.r.e.). According to Westview, it can collect all coverages afforded by the policy because the deed of trust between TTSF and the original mortgagee required TTSF to procure insurance for the mortgagee's benefit. Stated differently, Westview contends that it has an equitable lien on the proceeds of all of coverage available to the named insured. *Cf. Trinity Nat'l Bank*, 763 S.W.2d at 54–55.

An equitable lien is imposed on insurance proceeds when (1) the named insured owns property, (2) a third party has a secured interest in the property, (3) the named insured agreed to protect the third-party's security interest by

14

obtaining insurance with a loss-payable clause in the third party's favor, and (4) the named insured failed to procure the agreed coverage.[6] *See id.* In those circumstances, the third party is entitled to an equitable lien in the amount of the outstanding secured debt on the insurance proceeds under the principle that "equity treats that as done which should have been done." *Super-Cold Sw. Co.*, 225 S.W.2d at 927. The equitable lien then fulfills the missing loss-payable clause's purpose "to protect the security interest of one who has advanced money to others for the purchase of property" by allowing the third party to recover insurance proceeds up to the amount of the outstanding debt "so that the mortgagee, who has advanced money on the property, will be protected." *Helmer v. Tex. Farmers Ins. Co.*, 632 S.W.2d 194, 196 (Tex. App.—Fort Worth 1982, no writ). *Compare Trinity Nat'l Bank*, 763 S.W.2d at 55 (holding that a mortgageholder could not recover under the equitable-lien doctrine where the property owner's debt had been extinguished by the mortgageholder's foreclosure) *with Wade v. Seeburg*, 688 S.W.2d 638, 639 (Tex. App.—Texarkana 1985, no writ) (holding that, under the equitable-lien doctrine, the trial court correctly awarded the secured party the amount of the outstanding debt). Thus, an equitable lien will not be imposed if the named insured no longer owns the property or if the debt which the property secured has been extinguished. *See Chartis Specialty Ins. Co. v. Tesoro Corp.*, 113 F. Supp. 3d 924, 938 (W.D. Tex. 2015), *aff'd sub nom. AIG Specialty Ins. Co. v. Tesoro Corp.*, 840 F.3d 205 (5th Cir. 2016); *Helmer*, 632 S.W.2d at 196.

---

[6] We have stated the requirements as they apply in the context of a mortgagor and mortgagee, but the same principles apply when the relationship between the named insured and the third party is that of vendee–vendor or lessee–lessor. *See, e.g.*, *State Farm Fire & Cas. Co. v. Leasing Enters., Inc.*, 716 S.W.2d 553, 554 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (lessee–lessor); *Wade v. Seeburg*, 688 S.W.2d 638, 639 (Tex. App.—Texarkana 1985, no writ) (vendee–vendor).

Although Westview produced some evidence that TTSF agreed to procure insurance covering the mortgageholder's interest, Westview did not establish that the other requirements for imposing an equitable lien were satisfied. To the contrary, the evidence conclusively establishes that TTSF fulfilled its obligation to obtain a policy containing a loss-payable clause protecting the mortgageholder's interest and that, at the time of loss, TTSF neither owned the property nor owed a particular amount on the mortgageholder's note. Westview therefore is not entitled to an equitable lien on insurance proceeds payable under the named insured's coverage.[7]

### d. Coverage mandated by Texas Insurance Code section 862.055

Finally, Westview represents that Texas Insurance Code section 862.055 "entitles lenders to collect fully on a fire insurance policy if the named insured cannot do so, as was the case here."[8] But this statute actually says that "[t]he interest of a mortgagee" under a fire-insurance policy "may not be invalidated" by the mortgagor's or property owner's act or neglect, or by an occurrence beyond their control. *See* TEX. INS. CODE ANN. § 862.055 (West 2009).

This statute does not apply here because Westview's interest as a mortgagee was not invalidated. To the contrary, Westview was treated as a mortgagee under the policy, and in that capacity, was paid more than $334,000.

---

[7] This argument fails for the additional reason that TTSF's coverage was limited to its interest in the property at the time of the loss. *See infra* at III.B. Because TTSF no longer had an interest in the property when the fire occurred, no insurance proceeds were payable to TTSF, and thus, there were no insurance proceeds to which a mortgageholder's equitable lien could attach.

[8] Capitalization omitted.

For all of the foregoing reasons, we overrule Westview's challenge to the trial court's partial summary judgment on the scope of its coverage under the policy.

## B.  Directed Verdict on Limitations Grounds

A trial court properly directs a verdict for a defendant if the evidence conclusively establishes a defense to the plaintiff's cause of action.  *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).  When analyzing a directed verdict, we review the evidence in the light most favorable to the party against whom judgment was rendered to determine if any probative evidence raises a material fact issue on the question presented.  *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 220 (Tex. 2011) (sub. op.).  If there is conflicting probative evidence on the issue, then the jury must be allowed to decide the matter.  *See White v. Sw. Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983).

King-Phillips successfully moved for a directed verdict on the ground that the two-year statute of limitations barred Westview's causes of action for negligent misrepresentation and for violations of the DTPA and the Insurance Code.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West Supp. 2016) (negligent-misrepresentation limitations); TEX. BUS. & COM. CODE ANN. § 17.565 (West 2011) (DTPA limitations); TEX. INS. CODE ANN. § 541.162 (West 2009) (limitations for violations of Chapter 541 of the Insurance Code).  The statute of limitations began to run when these causes of action accrued.  *See Knott*, 128 S.W.3d at 221.  Ordinarily, "a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred."  *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)).

17

"Generally, when a cause of action accrues is a question of law." *Knott*, 128 S.W.3d at 221.

The parties agree that Westview's causes of action would have accrued when its claims were denied. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998) (sub. op.); *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828, 829 (Tex. 1990). We accordingly review the evidence to determine if King-Phillips and Landmark conclusively established that Landmark denied the claims before August 2010, two years before Westview filed suit.

The record conclusively establishes that Westview's causes of action accrued not later than March 2009. The evidence is uncontroverted that McGehee informed Yetiv on November 13, 2008, that transfer of coverage from TTSF to Westview was within the carrier's discretion. On December 5, 2008, King-Phillips's CEO informed Westview that King-Phillips was unable to transfer TTSF's coverage to Westview; in his answering correspondence, Yetiv referred to that letter as "your denial letter." After Yetiv reported the fire in January 2009, Landmark's coverage counsel Stephen Wedemeyer wrote Yetiv that TTSF's coverage had not been transferred to Westview, and on March 9, 2009, Landmark's adjuster Andy McRae wrote Yetiv that Landmark would pay Westview as a mortgageholder for loss or damage to buildings or structures.[9]

Wedemeyer wrote Yetiv twice more in March 2009. In the first of these letters, Wedemeyer specifically told Yetiv that the policy did not cover the mortgageholder for (1) damage to or loss of certain business personal property, (2) personal property of others, (3) damage to or loss of accounts receivable,

---

[9] As previously mentioned, the policy defined "building" to include certain business personal property.

18

(4) valuable papers and records, or (5) any lost business income.  At trial, Yetiv admitted that he understood from that letter that Landmark was limiting Westview's coverage to that of a mortgageholder.  In Wedemeyer's second letter that month, he addressed Westview's assertion of claims on TTSF's behalf.  Wedemeyer pointed out that under the policy's terms, TTSF's coverage did not exceed its financial interest in the property on the day of the fire, and that Yetiv already had informed Landmark that Westview acquired all of TTSF's financial interests in the covered property as part of the foreclosure.  Yetiv testified at trial that he understood from this letter that Landmark would not pay Westview for claims made on TTSF's behalf.  Thus, by March 2009, Landmark had communicated—and Westview's principal admittedly understood—that Landmark would pay Westview in accordance with the mortgageholder's provision, but had denied coverage of Westview's claims on TTSF's behalf, as well as Westview's claims for (1) business personal property not included within the mortgageholder's building-and-structures coverage, (2) personal property of others, (3) loss of accounts receivable, (4) valuable papers and records, and (5) lost business income.

Westview nevertheless argues on appeal that its negligent-misrepresentation, Insurance Code, and DTPA claims against King-Phillips never accrued, or if they did, they accrued no earlier than November 2011.[10]  Both arguments rest on the premise that Landmark never denied "the claim" but was simply "stringing [Westview] along."  In support of this premise, Westview cites Landmark's corporate representative Mark Schwartz's testimony agreeing that there were "still

---

[10] Citing *Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 288–89 (Tex. App.—El Paso 2010, no pet.), Westview represents that if an insurer never denies the claim, then causes of action for negligent misrepresentation or for violations of the DTPA or Chapter 541 of the Insurance Code never accrue.  The *Lozada* court did not so hold, but instead affirmed a summary judgment on limitations grounds based on a denial letter expressly stating that "no policy was in force and no benefits are payable."  *Id.* at 289.

19

some items of the claim that were open" in November 2011, and that if Westview had submitted receipts and invoices in November 2014, Landmark would have considered them.

The cited testimony provides no support for Westview's position because "the claim" to which Schwartz referred is not the same "claim" on which Westview's negligent-misrepresentation, Insurance Code, and DTPA causes of action against King-Phillips were based. Schwartz was speaking about Westview's claims that were in fact covered under the mortgageholder's provision or the emergency-expenses provision.[11] As discussed further *infra*, Landmark had requested documentation in 2009 to support some of the amounts claimed under these provisions, and when Westview finally responded in November 2011, Landmark paid the claims that were supported by documentation. In contrast, Westview's negligent-misrepresentation, Insurance Code, and DTPA claims against King-Phillips were based on McGehee's alleged misrepresentation that the policy provided coverage for business personal property, loss of important papers, and business interruption. Landmark's 2011 payment of Westview's covered claims does not affect its 2009 denial of distinct claims that were not covered.

After considering each of Westview's arguments on the subject, we conclude that the trial court did not err in granting King-Phillips's motion for directed verdict on Westview's claims against it for negligent misrepresentation and for violations of the DTPA and the Insurance Code.

---

[11] The policy's "Duties in the Event of Loss or Damage" provision requires the claimant to "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim."

## C. Evidentiary Rulings

Westview contends that the trial court erroneously excluded evidence that, after a different mortgagee foreclosed on a different property covered by the Landmark policy, Landmark added the mortgagee to the policy as an additional named insured. Specifically, when FirstVal obtained the EPI from King-Phillips in February 2008, FirstVal was the mortgagee of both the Westview Forest Apartments and the Kingsgate Village Apartments. Months later, FirstVal foreclosed on the Kingsgate Village Apartments and obtained its own insurance coverage. FirstVal and McGehee then discussed adding FirstVal as a named insured to the Landmark policy. FirstVal canceled its independently obtained insurance, and in late November 2008, Landmark issued an endorsement retroactively covering FirstVal as an additional named insured on the Kingsgate Village Apartments, effective as of the date FirstVal became the owner. The endorsement is part of the insurance policy admitted into evidence, but because it is undisputed that Landmark did not issue a named-insured endorsement to Westview, the trial court excluded certain testimony about the FirstVal/Kingsgate Village endorsement. Westview challenges the exclusion of this evidence.

We review a trial court's evidentiary rulings for abuse of discretion. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). Because the trial court abuses its discretion only if its ruling is arbitrary or unreasonable, *see Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), we will uphold the trial court's ruling if there is any legitimate basis for it. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We will reverse based on an erroneous evidentiary ruling only if the ruling probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). To determine whether the erroneous ruling probably had such an effect, we review the

21

entire record and require the complaining party to demonstrate that the judgment turned on the excluded evidence. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000).

According to Westview, evidence that Landmark issued an endorsement retroactively providing FirstVal named-insured coverage on the Kingsgate Village property should have been admitted to correct a false impression that a lender never could become a named insured on the policy. Westview contends that Landmark or King-Phillips injected the issue at trial when questioning Westview's expert Zachary Hirsch, King-Phillips's CEO Ty Hunter, and Landmark underwriter Bob English. Westview asserts that the trial court's ruling on a motion in limine prevented it from impeaching these witnesses' testimony.

The trial court's ruling on a motion in limine could not have prevented Westview from impeaching a witness's testimony, because a limine order is not an evidentiary ruling. By such an order, the trial court neither admits nor excludes evidence, but merely requires a party to obtain the trial court's permission, at the bench or otherwise outside of the jury's presence, before asking potentially prejudicial questions or introducing potentially prejudicial evidence. *See Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 91 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Union Carbide Corp. v. Burton*, 618 S.W.2d 410, 415 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). Westview did not seek relief from the limine ruling on the ground that Landmark or King-Phillips had opened the door to the admission of evidence to correct an alleged false impression created by Hirsch's, Hunter's, or English's testimony.

Westview sought relief from the limine order only during the direct examination of one of its own attorneys by another of its attorneys. Westview's attorney John Quinlan had advised Westview on the purchase of FirstVal's note on

the Westview Forest Apartments and Westview's foreclosure on the property. To provide that advice, Quinlan had reviewed FirstVal's file on the Westview Forest property. At trial, Yetiv asked Quinlan if he also had reviewed FirstVal's file on the Kingsgate property. Quinlan said that he had, and he was beginning to add to that answer when King-Phillips's counsel objected on the ground of relevance. When the trial court sustained the objection, Yetiv requested a bench conference during which he stated that Quinlan developed some of his opinions about McGehee's apparent authority based on Quinlan's review of FirstVal's file on the Kingsgate property. Yetiv said that Quinlan was "going to talk about what his perceptions were as he was advising [Westview] in this transaction." According to Yetiv, Quinlan would testify that he "became aware through his communications with [FirstVal's] Dwayne Young" and through his review of emails in FirstVal's file that McGehee had assured Young that FirstVal's interest in Kingsgate "was still covered under this policy" even after FirstVal foreclosed on the property. It apparently was Quinlan's belief that because Landmark added FirstVal to the policy as an additional named insured after FirstVal foreclosed on the Kingsgate Village Apartments, Landmark similarly would add Westview to the policy as an additional named insured after Westview foreclosed on the Westview Forest Apartments. Quinlan arrived at that conclusion because, in an email chain about whether FirstVal had coverage for Hurricane Ike's damage to the Kingsgate property, Young wrote, "Just off the phone with Greg [McGehee]. After our discussions I am comfortable that FirstVal is protected on Kingsgate." In another email, Quinlan asked Young, "Is there any issue with the underwriter that a new owner, by virtue of a foreclosure, is being covered, who is different from the owner under the group policy[?]" Young replied, "We were assure[d] it did not matter on kinsgate [sic] and we are moving forward with claim processing. Kingsgate [sic] would be the same scenario."

23

Over the course of the extended bench conference, the defendants made several counter-arguments, and the trial court did not specify which ones it found persuasive, ruling only that Yetiv's request was denied. On this record, we cannot say that any of the defendants' counter-arguments lack merit. Among other things, opposing counsel pointed out that Young's communications with McGehee concerned windstorm coverage under a policy issued by Westchester rather than property coverage under Landmark's policy. They also showed that none of the emails were from Landmark (or even from McGehee); thus, neither Young's statements nor the inferences Quinlan drew from those statements were relevant to the issue of King-Phillips's apparent agency to bind Landmark, because when determining whether apparent authority exists, "only the conduct of the principal is relevant." *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). They further reminded the trial court of its pretrial ruling that, due to the inadequacy of Westview's disclosures, Westview could not introduce testimony "on the perception of other apartment owners and other insurance matters," and they pointed out that Quinlan is an apartment owner. The defendants also argued that the probative value of Quinlan's testimony was outweighed by the danger of unfair prejudice. While Landmark did add FirstVal as an additional named insured on the Kingsgate property, it did so in late November 2008—after Quinlan reviewed FirstVal's file, and after the fire at Westview Forest Apartments. The testimony would be prejudicial for the further reason that Landmark's decision to make a different company an additional named insured on a different property did not obligate it to make Westview an additional named insured on the Westview Forest property.

Because the trial court would not have abused its discretion in excluding the proffered testimony on any of these grounds, we overrule this issue.

24

**D.	The Jury Charge and the Factual Sufficiency of the Jury's Findings**

Westview contends both that the trial court erred in submitting or failing to submit certain questions, definitions, and instructions to the jury, and that the jury's answers to the questions submitted are based on factually insufficient evidence. The standard of review intertwines these issues. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003) (explaining that, in a factual-sufficiency review, "[t]he starting point generally is the charge and instructions to the jury").

We review a trial court's jury-charge rulings for abuse of discretion. *See Sw. Energy Prod. Co.*, 491 S.W.3d at 727. If the trial court abused its discretion, we will reverse only if the error was harmful. *Id.* at 728. A charge error harmed the appellant only if it "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case" on appeal. *See* TEX. R. APP. P. 44.1(a); *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012).

Our review of factual sufficiency varies depending on whether there was a valid objection to the jury charge. Absent a valid charge objection, we measure the factual sufficiency of the evidence by the charge actually submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 629 (Tex. App.—Fort Worth 2011, pet. denied) (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2003)). On the other hand, if the complaining party preserved a valid objection to a defective charge, then we measure the sufficiency of the evidence by the charge the trial court should have given. *Cf. Wolff*, 94 S.W.3d at 530.

Whether we are measuring the evidentiary sufficiency against the charge that was given or against the charge that should have been given, we review all of the pertinent evidence in a neutral light. *See Golden Eagle Archery*, 116 S.W.3d at

25

761; *United Nat'l Ins. Co. v. AMJ Invs., LLC*, 447 S.W.3d 1, 7 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd). We will set aside the finding only if the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of the evidence, that the finding should be set aside and a new trial ordered. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016); *Barker v. Eckman*, 213 S.W.3d 306, 313 (Tex. 2006). Given this standard of review, more evidence is required to set aside a finding than to uphold it. *See AMJ Invs.*, 447 S.W.3d at 7.

Because we must measure the factual sufficiency of a finding differently if Westview's complaints about that part of the charge are valid, we address each allegation of factual insufficiency only after first determining if that part of the charge was erroneous. To avoid repetition, we will address Westview's complaints of charge error and factual insufficiency in tandem by working our way through the charge in order, and when we reach a challenge to a question, an instruction, a definition, or a finding, we will dispose of any charge-error complaint before addressing the factual sufficiency of the evidence to support the finding. First, however, we discuss Westview's complaint about a charge omission, namely, that the trial court erred in refusing to submit a question and accompanying instruction concerning Insurance Code and DTPA liability.

### 1.    *The proposed Chapter 541 and DTPA question and instruction*

In a case tried to a jury, the trial court must include in the charge the questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* TEX. R. CIV. P. 278. The instructions and definitions are those "as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. A proper jury instruction is one that assists the jury, accurately states the law, and is supported by the pleadings and the evidence. *See Columbia Rio Grande*

26

*Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009). If the trial court refuses a requested instruction on an issue raised by the pleadings and the evidence, then we must determine whether the instruction was reasonably necessary for the jury to render a proper verdict. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam).

Westview submitted a proposed question and instruction under the heading, "CHAPTER 541/DTPA – LIABILITY – AGENCY UNDER INS. CODE CH. 4001." Westview maintains that under Texas Insurance Code section 4001.051(b)[12] and certain cases interpreting that provision, King-Phillips was Landmark's agent as a matter of law. Westview therefore asked the trial court to submit a jury question concerning King-Phillips's and Landmark's liability under

---

[12] That provision is as follows:

> Regardless of whether the act is done at the request of or by the employment of an insurer, broker, or other person, a person is the agent of the insurer for which the act is done or risk is taken for purposes of the liabilities, duties, requirements, and penalties provided by this title [i.e., Title 13, "Regulation of Professionals"], Chapter 21 [which is inapplicable here], or a provision listed in Section 4001.009 if the person:
>
> (1)     solicits insurance on behalf of the insurer;
>
> (2)     receives or transmits other than on the person's own behalf an application for insurance or an insurance policy to or from the insurer;
>
> (3)     advertises or otherwise gives notice that the person will receive or transmit an application for insurance or an insurance policy;
>
> (4)     receives or transmits an insurance policy of the insurer;
>
> (5)     examines or inspects a risk;
>
> (6)     receives, collects, or transmits an insurance premium;
>
> (7)     makes or forwards a diagram of a building;
>
> (8)     takes any other action in the making or consummation of an insurance contract for or with the insurer other than on the person's own behalf; or
>
> (9)     examines into, adjusts, or aids in adjusting a loss for or on behalf of the insurer.

TEX. INS. CODE ANN. § 4001.051(b) (West 2009).

27

the DTPA and Texas Insurance Code Chapter 541 (similarly titled "Unfair Methods of Competition and Unfair or Deceptive Acts or Practices") and to include the instruction, "For the purposes of this question, you are instructed that the conduct of Landmark includes the conduct of King-Phillips." The trial court refused the request.

On appeal, Westview focuses on the trial court's failure to instruct the jury that King-Phillips was Landmark's agent, but because the instruction was submitted only as part of a question about liability under the DTPA and Chapter 541 of the Insurance Code, our resolution of this matter turns on whether the trial court abused its discretion in refusing to submit the question. As previously discussed, the trial court appropriately granted King-Phillips's request for a directed verdict on limitations grounds on certain of Westview's claims, including its DTPA and Insurance Code claims. Because Westview's claims against King-Phillips under these provisions are time-barred, the trial court did not abuse its discretion in refusing to submit the question as to King-Phillips's liability.

As to Landmark's liability, Westview admitted at trial that, with the exception of its breach-of-contract claim, all of its claims against Landmark were based on the agency theory that Landmark was liable for King-Phillips's conduct. But, a claim against a principal based on an agent's conduct is a claim of derivative liability, and is dependent on the primary wrongdoer's liability. *See El Paso Nat. Gas Co. v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993). Under Westview's theory, King-Phillips was the primary wrongdoer, and as King-Phillips's principal, Landmark was derivatively liable. Thus, even assuming, without deciding, that King-Phillips were Landmark's agent, King-Phillips's successful limitations defense disposed of the DTPA and Insurance Code claims against it. Because King-Phillips could not be held liable as an agent, Landmark could not be held

derivatively liable as the principal. *See Featherston v. Weller*, No. 03-05-00770-CV, 2009 WL 1896072, at \*5 (Tex. App.—Austin July 3, 2009, no pet.) (mem. op.) (explaining that there is no derivative liability where the primary wrongdoer successfully asserts an affirmative defense); TEX. R. CIV. P. 94 (identifying limitations as an affirmative defense).

Westview gives two reasons for concluding that the trial court abused its discretion in refusing the requested instruction, but neither rationale is persuasive.

First, Westview argues that the trial court's refusal to include an agency instruction was inconsistent with its earlier partial summary-judgment ruling that King-Phillips was Landmark's agent as a matter of law under section 4001.051(b) of the Insurance Code. In that ruling, the trial court specified that it granted Westview's summary-judgment motion only "as it relates to claims brought under Chapter 541 of the Texas Insurance Code." After the trial court properly directed a verdict as to that time-barred cause of action, there was nothing left of Westview's claims under Chapter 541 to submit to the jury. Thus, refusing to submit a Chapter 541 question to the jury was not inconsistent with the trial court's summary-judgment ruling, whereas submitting the question would have been inconsistent with the trial court's directed-verdict ruling.

Second, Westview contends that in refusing the requested instruction that King-Phillips was Westview's agent as a matter of law, "the trial court erred in limiting the application [of] § 4001.051(b) only to Chapter 541 claims." Westview argues that the trial court instead should have instructed the jury that King-Phillips was Landmark's agent for the purpose of Westview's fraud claim. By its terms, however, section 4001.051(b) creates an agency relationship only "for the purposes of the liabilities, duties, requirements, and penalties" of specific statutes; it does not purport to create an agency relationship for the purpose of a common-law fraud

29

claim. Moreover, Westview submitted this agency instruction only as part of its requested question on DTPA and Insurance Code claims.

Because Westview's proposed jury question and its accompanying instruction were directed only to claims that had been appropriately eliminated from the case on limitations grounds, and because the proposed instruction did not apply to Westview's common-law fraud claim, the trial court did not abuse its discretion in refusing to include it in the charge. We overrule these complaints.

### 2. Question 1: Landmark's alleged failure to comply with the Policy

In Question 1 of the charge, the jury was asked if Landmark failed to comply with the policy by failing to pay for all damages to the Building that were caused by the fire. The question included an instruction that "Building" means all structures on the premises, including completed additions, fixtures, permanently installed machinery and equipment, together with "maintenance and service personal property" owned by Westview. In the "definitions" section of the charge, the trial court explained that "'maintenance and service personal property' means items used to maintain, care for, keep up, repair, restore, replace, preserve, or protect structures located at the premises,"[13] and includes keys, key-making machines, carpet-shampooing machines, and other maintenance tools and parts, but does not include office supplies, interior office furniture, or televisions. Westview contends both that the trial court erred in refusing to include an additional instruction, and that the jury's failure to find that Landmark breached the contract is against the great weight of the evidence.

---

[13] Capitalization omitted.

30

### a. The trial court did not abuse its discretion in failing to instruct the jury that the Policy covered "important papers" and "dead files."

Westview argues on appeal that Question 1 of the charge is defective because its accompanying instructions and the definition of "maintenance and service personal property" do not mention "important papers" and "dead files." According to Westview, the omission of these two items is inconsistent with the trial court's ruling on the first day of trial that Westview "could collect all 'Buildings' coverages, including 'important papers' and 'dead files.'"

This is not an accurate representation of the trial court's ruling. The trial court instead ruled that "whether the following categories of personal property fall within the definitions of Building is a question of fact for the jury to decide: (1) Files of active residents, (2) Files of inactive residents . . . ." Because Westview cites this ruling, we understand Westview to use the expression "important papers" to mean files of active residents and "dead files" to mean files of inactive residents. In accordance with its earlier ruling, the trial court left the jury to decide whether these items were included in "maintenance and service personal property." We overrule this complaint.

### b. The evidence is factually sufficient to support the finding that Landmark did not fail to comply with the Policy.

Westview asserts that the great weight of the evidence shows that Landmark failed to comply with the policy because it did not pay for all (1) keys, (2) key-making machines, (3) carpet-shampooing machines, and (4) maintenance tools and parts. In support of this position, Westview cites a November 2011 letter to Westview from Landmark's adjuster Andy McRae. In the letter, McRae stated that on receipt of executed copies of Westview's sworn proof-of-loss statement and agreement for future payment, a check for a further $20,166.41 would be

forwarded to Westview's principal, including $9,595.21 for "maintenance and service personal property."

In its brief, Westview does not specifically discuss the evidence concerning the amount, if any, that Landmark was required to pay for keys, key-making machines, or carpet-shampooing machines, and there is conflicting evidence on these topics. The policy provided coverage for the replacement cost of these items, but Landmark was not required to pay until the property was actually repaired or replaced, and replacement cost was payable only if the replacement was "made as soon as reasonably possible after the loss or damage." McRae testified that he did not believe the key-making and carpet-shampooing machines were covered, but Landmark's corporate representative Mark Schwarz testified that Landmark denied payment for the carpet-shampooing machine because it was not covered, and denied payment for keys and for the key-making machine because Westview failed to document the amounts due by providing estimates or receipts.

According to Yetiv's testimony, however, none of these amounts were documented. Westview replaced the key-making and carpet-shampooing machines, but it did not provide the receipts to Landmark. Westview also did not document the cost for replacing the master keys for the apartment doors and mailboxes, nor did it establish that Westview had replaced them. Yetiv's correspondence with the adjuster instead suggests that two-and-a-half years after the fire, no replacement triggering the duty to pay had been performed.

Westview does not identify any other maintenance tools and parts at issue. From our review of the record, Landmark appears to have paid Westview for all of its documented, covered losses. Thus, after reviewing the evidence in a neutral

32

light, we conclude that it is factually sufficient to support the jury's finding that Landmark did not fail to comply with the policy. We overrule this complaint.[14]

### 3. Question 5: King-Phillips's alleged apparent authority to act for Landmark

The next question answered by the jury was Question 5, in which the jury failed to find that King-Phillips acted with Landmark's apparent authority. Westview argues that an instruction accompanying the question constituted an impermissible comment on the weight of the evidence and that the jury's failure to find apparent authority is against the great weight of the evidence.

We need not address either argument because, as will be seen, the jury's answer to this question is immaterial. This is so because "[a]pparent authority is not itself a cause of action; rather, it can be used to establish a principal's liability when there is no actual authority." *Millan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760, 767 (Tex. App.—San Antonio 2002, pet. denied) (en banc) (citing *Baptist Mem'l Hosp. Sys. v. Sampson*, 69 S.W.2d 945, 949 (Tex. 1998)). An agent's actions within the scope of its apparent authority are binding on the principal. *See Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984). Thus, if King-Phillips acted within the scope of its apparent authority in committing some wrongdoing, then Landmark could be held liable for King-Phillips's conduct. Similarly, if King-Phillips had apparent authority to make a promise on Landmark's behalf, then Landmark could be held liable for failure to fulfill the promise. But, a finding that King-Phillips had apparent authority to act for Landmark is immaterial unless there also is a finding that King-Phillips engaged in some wrongdoing or that Westview reasonably relied on a promise made by King-Phillips on Landmark's behalf. *Cf. Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166,

---

[14] Each factual-sufficiency complaint is a part of Westview's sixth issue.

33

172 (Tex. 1999) (explaining that a properly submitted question can be rendered immaterial by other findings).

The jury made no findings that could be affected by a finding that King-Phillips had apparent authority to act for Landmark. The jury was asked if King-Phillips committed fraud and if Westview actionably relied, before the fire, on a promise by King-Phillips. Because the jury answered both questions in the negative—and as discussed *infra*, those answers are supported by the record—the jury's failure to find that King-Phillips acted with Landmark's apparent authority is immaterial. We therefore do not address this complaint further.

### 4. *Question 6: Westview's alleged reliance on a promise by King-Phillips*

In Question 6 of the charge, the jury was asked if Westview actionably relied before November 5, 2008, on a promise by King-Phillips. The question was accompanied by two instructions. In the first, the trial court stated that a party actionably relies on a promise if the reliance was (a) substantial, (b) detrimental to the relying party, and (c) foreseeable to the promising party. In the second instruction, the trial court stated that King-Phillips did not have a duty to explain the terms, conditions, exclusions, or limitations of the policy to Westview. Westview again argues both that the charge is erroneous and that the jury's failure to find in Westview's favor is against the great weight of the evidence.

#### a. The trial court did not impermissibly comment on the weight of the evidence.

Westview contends that the trial court abused its discretion in submitting the instruction that actionable reliance must be substantial, detrimental to the relying party, and foreseeable to the promising party. According to Westview, the instruction fails to follow the pattern jury charge for promissory estoppel and

"highlights the obstacles to getting to a 'yes' answer." We understand the latter assertion as an argument that the instruction is an impermissible comment on the weight of the evidence. We disagree that the trial court abused its discretion by including this instruction in the charge.

In the pattern jury charge, the promissory-estoppel question is phrased, "Did *Paul Payne* substantially rely to *his* detriment, on *Don Davis*'s promise, if any, and was this reliance foreseeable by *Don Davis*?" COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., *Texas Pattern Jury Charges: Business* PJC 101.41 (2014). The pattern jury charge and the charge submitted differ in form, but not in substance: both require a jury to answer "yes" only if the plaintiff's reliance was substantial, the reliance was detrimental to the plaintiff, and the reliance was foreseeable by the defendant. The pattern jury charge submits the issue in a single compound question, whereas the trial court submitted the issue as a question with an accompanying instruction.

Westview also argues that the trial court erred in instructing the jury that King-Phillips did not have a duty to explain the terms, conditions, exclusions, or limitations of the policy to Westview. Although Westview objected to the inclusion of this instruction in a negligent-misrepresentation question, Westview did not object to the instruction in connection with the promissory-estoppel question under discussion.[15] This complaint therefore is waived.

---

[15] Westview raised this objection to an instruction accompanying "Question 6," but the objection was to a different "Question 6." At the start of the charge conference, the negligent-misrepresentation claim appeared as Question 6, and the promissory-estoppel question under review was Question 8. The trial court then sustained objections to, and removed, Questions 6 and 7. As a result, the promissory-estoppel question that was discussed in the record as Question 8 was submitted to the jury as Question 6. Westview tacitly acknowledges this, because when discussing its objections to the promissory-estoppel question, Westview cites to the part of the charge conference in which the trial court heard Westview's objections to what was then Question 8.

Westview also says that the trial court erred in refusing to submit Westview's proposed promissory-estoppel question, which Westview contends tracks the pattern jury charge. The pattern jury charge asks if the plaintiff relied on a promise, "if any," but Westview's proposed question omits this language. Moreover, Westview's proposed question asks the jury if Westview relied on a promise by King-Phillips or Landmark, but there is no evidence that Westview relied on a promise by Landmark. The trial court accordingly did not abuse its discretion in refusing to submit Westview's proposed question. *See* TEX. R. CIV. P. 278.

We overrule this charge-error complaint.

### b. The great weight of the evidence does not show that Westview substantially relied before November 5, 2008, on a promise by King-Phillips.

In arguing that the great weight of the evidence shows that it substantially relied to its detriment on a promise by King-Phillips, Westview maintains that the EPI was a representation of coverage; that Westview substantially relied on the EPI in paying Westview Forest Apartments' share of the cost to keep the policy from lapsing; and that Westview was harmed because it did not receive the coverage available to a named insured. The EPI, however, contains no representation that Westview has any coverage. It instead addresses only the coverage provided to named insured TTSF as of February 2008, and identifies FirstVal as the mortgagee. Yetiv testified at trial that McGehee gave him the EPI[16] without explaining the coverage that the policy might provide to Westview, and as previously discussed, the policy did not cover Westview as a named insured or an

---

[16] In his deposition testimony, however, Yetiv testified that he did not recall how or from whom he received the EPI.

36

additional insured.  Yetiv admitted that McGehee never told him Westview had such coverage.

Further, Westview was not harmed by repaying FirstVal for the portion of the premium allocable to Westview Forest Apartments, because as FirstVal's successor, Westview's interest in the property was covered to the same extent that FirstVal's had been.  FirstVal's interest in the property as a mortgageholder had been covered, and so too was Westview's.  In return for the premium payment of $6,925.56 for its share of the property coverage, Westview was paid more than $334,000 under the mortgageholder provision of the policy.

The great weight of the evidence instead shows that the premium payment maintained the only coverage available for the property at that time.  Sixteen days before FirstVal sold the note on the property to Westview, Hurricane Ike struck the area.  King-Phillips's CEO Ty Hunter explained at trial that after a natural disaster, property insurers are unwilling to issue new policies covering property that might have preexisting damage, and McGehee's communications with Westview in October 2008 occurred after the property-insurance market had "collapsed" and "shut down" as a result of the hurricane.  In his emails, McGehee explained that property insurers would renew existing policies but were unwilling to write new ones.  King-Phillips's insurance expert Charles Comiskey similarly testified that it was important to maintain existing policies at that time because the "ability to go out and replace that coverage was nonexistent."  Moreover, the insurers' fears about writing new property-insurance policies would have applied to this property, because Westview itself introduced evidence that Westview Forest Apartments had been damaged in the storm.  On the first business day after the hurricane, FirstVal's attorney emailed TTSF's bankruptcy trustee that the property had been damaged, and the trustee responded by relaying the information to others—

including Young and McGehee—and including McGehee's contact information "so we can start the claims process." There is no evidence that any property insurer would have agreed to provide Westview with named-insured coverage in the few weeks between the hurricane and the fire.

We overrule this complaint.

### 5. Question 8: King-Phillips's and Landmark's alleged fraud

In Question 8 of the charge, the jury was asked if King-Phillips or Landmark committed fraud against Westview before the fire on November 5, 2008. The charge included instructions defining "misrepresentation" and permitting the jury to answer "yes" based on fraudulent misrepresentation or fraudulent non-disclosure. Westview contends that the jury's failure to find fraud by either defendant is against the great weight of the evidence because (a) King-Phillips committed fraud through McGehee's misrepresentation and non-disclosure, and (b) Landmark ratified King-Phillips's fraud by retaining the benefits of King-Phillips's unauthorized sale of Landmark's policies from 2004 through 2008.

Regarding King-Phillips, Westview contends that when McGehee solicited Westview's payment to maintain coverage in October 2008, he knew, and was obligated to tell Westview, that the payment would not buy Westview "any insurance." It is undisputed, however, that in return for its payment, Westview obtained coverage as a mortgageholder. Although Westview cites an email on October 10, 2008, in which Westview allegedly "specifically stated that it was willing to make the requested premium payment if it could be assured that it would be a named insured on the policy," the actual chronology and content of the emails exchanged show that no one asked McGehee if Westview could become a named insured until after the premium had been paid on Westview's behalf and with Westview's agreement.

The record shows that Quinlan emailed Yetiv that morning, "I have always thought that insurance ends with a change of ownership and that, therefore, there would have to be some agreement *from the insurer* to change the named insured. . . . Where is the contractual liability to pay?" (emphasis added). Yetiv responded to that question only after he had authorized FirstVal to pay the premium finance company Westview's share of the premium and FirstVal confirmed that it had wired the payment. Yetiv then asked Young, "Can we get a commitment from the insurance company/agent to submit Evidence of Insurance according to the terms you described naming Westview Drive Investments, LLC, as insured for the periods of time we discussed?" Young forwarded the email chain to McGehee, then added, "I assume you will have to name them as an additional insured to the policy." When McGehee responded several hours later, he said he did not know the answer, and that he wanted the carriers to answer the question. By answering, "I don't know," McGehee neither misrepresented the scope of coverage nor failed to disclose information. Moreover, Westview could not have relied on McGehee's answer, because Westview already had paid the premium through FirstVal. And, because McGehee did not commit fraud, King-Phillips also did not commit fraud.

As for Landmark, Westview argues that the insurer committed fraud by ratification, but as we have just seen, there was no underlying fraud to ratify. Westview asserts that Landmark also ratified fraud by King-Phillips in that, from 2004 through 2008, King-Phillips sold Landmark policies without Landmark's authorization; however, no such issue was tried.

We overrule this factual-sufficiency complaint.

### 6. Question 10: Landmark's alleged unfair or deceptive act or practice

In Question 10, the jury was asked if Landmark engaged in an unfair or deceptive act or practice that caused damage to Westview. The jury answered, "No." Westview contends that this answer is against the great weight of the evidence because between 2009 and 2011 Landmark neither investigated Westview's demands for proceeds covering "dead files," "important papers," "business interruption," and "maintenance tools and supplies," nor attempted in good faith to make a prompt, fair, and equitable settlement of those claims.

As we have seen, Westview had coverage only as a mortgageholder, and of the challenged categories of damages, only "maintenance tools and supplies" falls within the coverage afforded to mortgageholders. Because the policy did not afford Westview coverage for its business interruption or the loss of "dead files" or "important papers," Landmark had no duty to investigate or attempt to settle those claims.

As for Westview's maintenance tools and supplies, the overwhelming evidence shows that any investigative or payment delays were caused by Yetiv. Yetiv sent Landmark's adjuster McRae a "Summary of Remaining Claims" on October 26, 2009. The summary was written in three columns: "Description of The Personal Property Lost in the Fire," "Basis of Value Estimate," and "Estimated Value." The last row of the summary included the following description of lost personal property:

> Other office contents—furniture and office equipment including computers, printers, internet equipment, telephones, file cabinets, office supplies etc. In addition, we stored extensive maint supplies and maintenance equipment in the leasing office, and keys to all apts, the replacement of which has been very costly. Please note that the $70,000 estimate is a very rough estimate—I could be high or low. I

could look up credit card statements and prepare the spreadsheet that I discuss in the next column to come up with a more reliable estimate. But I don't want to do that until I know we are heading in the right direction by doing this.

In support of this estimate, Yetiv referred McRae to documents Yetiv said were "lists prepared by two members of the office staff (but not by me)." The lists were handwritten in Spanish and contained no mention of any item's value. McRae wrote to Yetiv on November 23, 2009 that further documentation was required, to include a legible itemized list of the damaged business personal property, its cost, its age, and any receipts or photographs to document the loss.

Yetiv did not respond to the request for further documentation for a year and a half. On June 2, 2011, he sent a spreadsheet to McRae, and his email transmitting the spreadsheet begins, "First, thanks for your patience in allowing me the extra time to respond to your letter of 11/23/2009 . . . ." Landmark then paid for the items that were properly documented.

We overrule this issue. Having now disposed of all of Westview's appellate complaints, we affirm the take-nothing judgment against it.

## IV. YETIV'S APPEAL

In three issues, Yetiv challenges the trial court's orders sanctioning him. We review a trial court's sanctions orders for abuse of discretion. *See Reule v. M & T Mortg.*, 483 S.W.3d 600, 624 & n.6 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *In re S.M.V.*, 287 S.W.3d 435, 442 (Tex. App.—Dallas 2009, no pet.). The trial court abuses its discretion if its ruling is not based on some evidence or is contrary to the only permissible view of properly admitted, probative evidence. *See Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam) (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding)).

41

## A.     Factual Background

The events culminating in the sanctions order began when, on the second day of trial, Yetiv stated for the first time that he delayed reporting the fire for two months on the advice of Westview's attorney Edward Rothberg.  Landmark responded by serving Rothberg with a subpoena deuces tecum requiring him to appear at trial with Westview's file.  Landmark's attorney Bruce Wilkin specifically wished to see the correspondence between Rothberg and Westview from the day after the fire until the day the fire was reported.  A similar subpoena was sent to the law firm where Rothberg worked during that time.  Westview moved to quash the subpoenas deuces tecum on the grounds, among others, that the subpoenas invaded the attorney-client privilege.[17]  In answer to that objection, Landmark's and King-Phillips's attorneys argued that Yetiv waived Westview's privilege when he testified about Rothberg's legal advice, and that the crime-fraud exception to the attorney-client privilege applied.  *See* TEX. R. EVID. 503(d)(1) (providing an exception to the privilege "[i]f the lawyer's services were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud").

The trial court partially denied the motion to quash, ruling that Yetiv's testimony both waived the attorney-client privilege and established that the crime-fraud exception applied to certain communications.  The trial court specifically referred to bankruptcy fraud and insurance fraud.  Yetiv requested an evidentiary hearing to determine whether the crime-fraud exception applied, and the trial court

---

[17] Yetiv also objected that Landmark, in response to requests for disclosures, had identified Rothberg as Westview's bankruptcy attorney, but had sought no discovery from him and did not identify him as a witness.  Landmark overcame that objection by pointing out that Rothberg was not identified in Westview's disclosure responses as "a person having any knowledge whatsoever."

responded, "It's my practice that I, of course, allow someone who's been implicitly or explicitly accused of something to definitely have their say."

The next day, the trial court heard Yetiv's and Rothberg's testimony outside the jury's presence. In response to questions from the trial court, Yetiv testified that he had wanted to obtain an EPI listing Westview as a named insured or an additional insured before reporting the fire. He stood by his earlier testimony, "I thought if we revealed the fire, they would say: No way we're doing that." King-Phillips's attorney read Yetiv's testimony to Rothberg, including Yetiv's statement that Rothberg and Quinlan had agreed that it would be best to get an EPI in Westview's name before reporting the fire. Rothberg was asked if he had agreed with Yetiv that it was best not to reveal the fire, and he testified that he had no recollection of discussions so long ago. Rothberg also stated that if he had been asked, he would have said that a company, situated as Westview was at the time of the fire, had no duty to report the fire to the bankruptcy trustee. Rothberg was not asked whether he would have said that such a company had a duty to report the fire to the insurance agency or the insurer. After the hearing, the trial court again ruled that the crime-fraud exception applied.

The next day—a Friday on which the trial was in recess—Yetiv wrote an email threatening to contact Wilkin's superiors and file grievances with the State Bar against him and his firm unless, by noon on the following Monday, Wilkin announced in open court, in language to be agreed upon, that there was no legal or factual basis for Wilkin's "allegations"; that Wilkin was sorry for having made them; and that Wilkin withdrew them entirely. Yetiv sent the email to Wilkin, to Westview's other trial attorney Michael Yanochik, and to John Quinlan.

Wilkin did not make the statement Yetiv demanded.

43

After all parties rested on Monday morning, Wilkin's co-counsel Stephen Wedemeyer brought Yetiv's email to the trial court's attention. Wedemeyer argued that the email violated Rule 4.04(b)(1) of the Texas Disciplinary Rules of Professional Conduct, which provides that "[a] lawyer shall not present, participate in presenting, or threaten to present . . . criminal or disciplinary charges solely to gain an advantage in a civil matter . . . ." *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.04(b)(1), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2013) (Tex. State Bar R. art. X, § 9). Noting that a show-cause hearing already had been set on whether to sanction Quinlan for violating the trial court's limine orders, Wedemeyer asked the trial court to "take this up at the same time after the jury gets the case." Yetiv responded that it was Wilkin who had violated the Rule 4.04; that there was nothing improper about contacting Wilkin's superiors; and that "it is absolutely my right to file a grievance" against Wilkin.

While the jury was deliberating the next day, Landmark's and King-Phillips's attorneys briefly argued that Yetiv's email violated Disciplinary Rule 4.04, and Yetiv responded that the email spoke for itself. After accepting the jury's verdict, the trial court ordered Yetiv to appear before it to show cause why the trial court should not sanction him. In the show-cause order, the trial court expressly relied upon its inherent power to sanction and upon Canon 3(D) of the Code of Judicial Conduct, which provides that "[a] judge who receives information clearly establishing that a lawyer has committed a violation of the Texas Disciplinary Rules of Professional Conduct should take appropriate action." *See* TEX. CODE JUD. CONDUCT, Canon 3(D)(2), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B (West 2013).

At the show-cause hearing, Yetiv testified that the email did not violate Rule 4.04 because his motive for threatening to file a grievance against Wilkin was not

to gain an advantage in the litigation. He stated that his intentions were to clear his name and "to find out if Mr. Wilkin had made an honest mistake or had done something improper that would trigger an obligation to report it to the State Bar." At the conclusion of the hearing, the trial court announced some initial findings, ordered Yetiv to complete twelve hours of continuing legal education on ethics, and stated that the court would refer the matter to the State Bar. Two weeks later, the trial court issued a written order containing these sanctions and additionally ordering Yetiv to pay Landmark's and King-Phillips's reasonable attorneys' fees incurred "as a result of the proceedings arising from [Yetiv's email]." The trial court invited Yetiv's opposing counsel to file attorney-fee affidavits, and stated a deadline for Yetiv to file a controverting affidavit.

Before the matter of the email finally was resolved, the trial court issued two more orders and held one more hearing. After Yetiv controverted the amount only of Landmark's attorney's fees, the trial court ordered Yetiv to pay King-Phillips's attorney's fees and issued supplemental findings of fact in support of that order. The trial court heard evidence on the amount of Landmark's reasonable and necessary attorney's fees, and then issued an order and supporting findings requiring Yetiv to pay that amount. The trial court incorporated its sanctions rulings in the final judgment. Yetiv asks us to reverse all three sanctions orders.

The trial court based the sanctions primarily on its findings that (1) Yetiv threatened to file a grievance against Wilkin for the sole purpose of gaining an advantage in this case, (2) sending the threatening email was an abusive tactic intended to obstruct justice, (3) Yetiv abused the judicial process, (4) his conduct delayed the orderly and expeditious proceedings in the case, and (5) the court's information clearly established that Yetiv violated Rule 4.04 of the Texas Disciplinary Rules of Professional Conduct. As in the show-cause order, the trial

45

court expressly stated that it sanctioned Yetiv pursuant to its inherent power and Judicial Canon 3(D)(2).

## B. Sanctions Under the Trial Court's Inherent Power

In Yetiv's first issue, he contends that the trial court abused its discretion in sanctioning him under its inherent power. Courts have the inherent power to discipline attorneys by imposing sanctions. *See In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (orig. proceeding) (per curiam). This includes the power to sanction individuals for abusing the judicial process or to ensure an adversarial proceeding. *See id.* (collecting cases). A court also may employ sanctions to aid in the exercise of its jurisdiction, in the administration of justice, or in the preservation of the court's independence and integrity. *See id.*; *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979); *Clark v. Bres*, 217 S.W.3d 501, 512 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

### 1. *Bad faith abuse of the judicial process*

In Yetiv's first argument for reversal of sanctions imposed pursuant to the trial court's inherent power, Yetiv focuses on bath faith abuse of the judicial process. A trial court has discretion to use its inherent power to sanction "to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts." *White v. Zhou Pei*, 452 S.W.3d 527, 546 (Tex. App.—Houston [14th Dist.] 2014, no pet.). These traditional core functions include hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgment, and enforcing its judgments. *See id.* Yetiv maintains that the trial court can use its inherent power to sanction only if it finds that the conduct at issue interfered with one of these five functions, but as we have just

seen, this is not an exhaustive list. *See In re Bennett*, 960 S.W.2d at 40; *Eichelberger*, 582 S.W.2d at 398.[18]

As *In re Bennett* illustrates, a trial court can properly find that an attorney abused the judicial process even if the trial court does not find that the attorney significantly interfered with its traditional core functions of hearing evidence, deciding issues of fact or law, or rendering and enforcing judgments. To avoid Nueces County's local rule requiring random assignment of cases, the attorney in *Bennett* filed seventeen lawsuits. *See In re Bennett*, 960 S.W.2d at 36. When the seventeenth suit was assigned to a judge that the attorney believed would be sympathetic, he amended the petition to add approximately seven hundred plaintiffs and then filed notices of nonsuit in the other sixteen lawsuits. *Id.* at 36–37. Judge Bennett, to whom the first case was assigned, found that the attorney had abused the judicial process by knowingly and intentionally violating the local random-assignment rule. *See id.* at 37, 39. The Texas Supreme Court upheld the trial court's sanctions under its inherent powers, explaining that the attorney's "conduct, if tolerated, breeds disrespect for and threatens the integrity of our judicial system." *Id.* at 40.

---

[18] The trial court also found that the email caused it "to expend valuable judicial resources of time and effort to investigate the incident" by drafting and serving the show-cause order, holding the show-cause hearing, drafting the sanctions orders, and holding an evidentiary hearing on Landmark's attorney's fees. We agree with Yetiv that the trial court could not properly sanction Yetiv under its inherent powers solely because it expended judicial resources in sanction-related proceedings. Drafting and serving the show-cause order and holding the show-cause hearing were prerequisites to the trial court's exercise of its inherent power to sanction, not its justification. *See Greene v. Young*, 174 S.W.3d 291, 298 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (stating that due process requires a trial court to provide notice and an opportunity to be heard before imposing sanctions pursuant to its inherent power). If an attorney or litigant interfered with the trial court's core judicial functions any time his conduct prompted a show-cause hearing, then the mere holding of a show-cause hearing would condemn him rather than protect his right to due process. As discussed further *infra*, however, other findings support the trial court's exercise of its inherent power to sanction Yetiv.

For similar reasons, we conclude that the trial court did not abuse its discretion in sanctioning Yetiv under its inherent power. This conclusion is supported by the trial court's findings that (a) Yetiv threatened to file a grievance against Wilkin solely to gain an advantage in this case, (b) sending the threatening email was an abusive tactic intended to obstruct justice, and (c) Yetiv abused the judicial process. In his email, Yetiv threatened to contact opposing counsel's employer and file grievances against opposing counsel and the attorney's law firm unless the attorney not only withdrew his successful arguments on his client's behalf, but also argued in favor of an adversarial party's position, in open court, and in words approved by Yetiv. Yetiv further pointed out that Quinlan was a client of Winstead P.C., the other attorney's law firm, and said that "[if Quinlan's] name appears in the record, I suspect he may wish to do the same, which may be especially disconcerting to Winstead given the fact that [Quinlan] is a Winstead client and has paid Winstead around $100,000 in fees."[19] In sum, Yetiv attempted to coerce opposing counsel into acting as the mouthpiece for the adverse party. A lawyer who attempts to coerce a person into recanting and reversing the person's unfavorable in-court statements undermines the integrity of the judicial system just as surely when the targeted person is an adverse attorney as when the person is an adverse witness.

## 2.    *Sufficiency of the trial court's findings*

Yetiv also contends that the trial court cited no evidence in support of its finding regarding abuse of the judicial process; however, he cites no authority holding that, when sanctioning a person pursuant to its inherent power, the trial court must describe the evidence on which it relied. *But cf. Zeifman v. Michels*,

---

[19] Yetiv stated that he "suspect[ed]" that Quinlan would complain to Winstead, but because Yetiv sent the email to Quinlan, it might be more apt to say that Yetiv "suggested" that Quinlan complain to Winstead.

212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied) ("The court must make findings on each material issue raised by the pleadings and evidence, but not on evidentiary issues."); *In re Marriage of Edwards*, 79 S.W.3d 88, 95 (Tex. App.—Texarkana 2002, no pet.) ("[A]n evidentiary issue is one the trial court may consider in deciding the controlling issue, but is not a controlling issue itself."). Moreover, the trial court quoted Yetiv's email in its sanctions order, and the email itself supports the trial court's findings.

### 3.    *Sufficiency of the evidence to support the findings*

Yetiv additionally argues that the trial court erred in finding that he threatened Wilkin with sanctions solely to gain an advantage in the case. According to Yetiv, he was motivated by an attempt to clear his name from the suggestion that he had engaged in a crime or fraud. The most telling piece of evidence on this issue is the email itself. We conclude that the face of the email and the inferences reasonably drawn from it support the trial court's finding.

Yetiv stated in the email, "I normally would have reserved this communication for after trial but I can't do that because I want the above statement in the record before trial ends." If Yetiv was motivated by an intent to clear his name, then a post-trial statement would have been just as effective as a statement made during trial.

From the course of these proceedings and from the content of the email, the trial court reasonably concluded that Yetiv was trying to accomplish by coercion what he failed to accomplish by argument or by evidence—namely, changing the trial court's ruling. The only evidence to the contrary is Yetiv's testimony about his motivation, but the trial court found that Yetiv was "not a credible witness" and that "[t]he manner in which he conducted himself while giving testimony showed

49

his testimony to be untrustworthy."[20]  *See Stearns v. Martens*, 479 S.W.3d 541, 556 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (stating that a trial court acts within its discretion in determining the credibility of the sanctioned individual's evidence).

Yetiv also devotes much of his brief to arguments that he did not commit insurance fraud or bankruptcy fraud.  Because no such finding was made, implied, or requested in the trial court, that issue is not properly before us.[21]  The issue presented instead is whether the trial court abused its discretion in sanctioning Yetiv.  The trial court did not sanction him for committing a crime or for fraud; it sanctioned him for using an abusive tactic intended to obstruct justice and for abusing the judicial process.  Yetiv has not demonstrated that the trial court abused its discretion in doing so.

## C.    Sanctions Under Judicial Canon 3(D)(2)

Judicial Canon 3(D)(2) provides that "[a] judge who receives information clearly establishing that a lawyer has committed a violation of the Texas Disciplinary Rules of Professional Conduct should take appropriate action."  The Canon does not specify what constitutes "appropriate action."

The trial court took two actions pursuant to the Judicial Canon.  First, the trial court ordered Yetiv to complete additional continuing legal education on the topic of ethics.  Second, the trial court directed the clerk of the court to forward to

___

[20] Italics omitted.

[21] Contrary to Yetiv's assumptions, the trial court's ruling that certain documents, if in existence, were discoverable under the crime-fraud exception to attorney-client privilege is not the equivalent of a finding that Yetiv in fact committed a criminal or fraudulent act.  *Compare Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (describing the elements of fraud by nondisclosure) *with In re Gen. Agents Ins. Co. of Am., Inc.*, 224 S.W.3d 806, 819 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding) (describing the showing necessary to bring evidence within the crime-fraud exception to attorney-client privilege).

the State Bar's Chief Disciplinary Counsel a transcript of the show-cause hearing and certified copies of the show-cause order, the sanctions order, and the exhibits offered at the show-cause hearing. Because those orders have been carried out, Yetiv's appeal of those portions of the sanctions order is moot.

Yetiv nevertheless contends in his second issue that the trial court abused its discretion "when it decided to pursue the sanctions prosecution rather than refer the matter to the State Bar," thereby committing "an impermissible 'judicial end run' around the well-established grievance rules and system." But once received by the State Bar's Chief Disciplinary counsel, the materials that the trial court ordered forwarded to that office became, by definition, "a grievance." *See* TEX. RULES DISCIPLINARY P. R. 1.06(R), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A-1 (West 2013) (defining a "grievance" as "a written statement, from whatever source, apparently intended to allege Professional Misconduct by a lawyer, or lawyer Disability, or both, received by the [State Bar of Texas's] Office of the Chief Disciplinary Counsel"); TEX. RULES DISCIPLINARY P. R. 1.06(W)(1) (defining "Professional Misconduct" to include any violation of the Texas Disciplinary Rules of Professional Conduct). Far from circumventing the grievance system, the trial court ordered a grievance referred to the appropriate authority.

In arguing that the trial court made a "judicial end run" around the grievance system, Yetiv may have intended to imply that if an attorney's alleged misconduct properly can be made the subject of a grievance, then the trial court is limited to referring the matter to disciplinary authorities and cannot use its inherent power to sanction the same conduct. We cannot imply such a rule. Courts have the inherent power to discipline attorneys, and the Texas Supreme Court has addressed some violations of the disciplinary rules under both the State Bar's disciplinary system

51

and its own inherent powers. *See, e.g.*, *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 732–33 (Tex. 1997) (order on denial of reh'g) (ordering attorneys who filed a motion for rehearing attacking the court's integrity to show cause why the court should not refer them to disciplinary authorities and impose monetary penalties).

Although Yetiv concedes that the Judicial Canons empower the trial court to refer an attorney's violation of the disciplinary rules to the Chief Disciplinary Counsel, he argues in his third issue that he did not violate Disciplinary Rule 4.04 as the trial court found. It is unnecessary for us to address that question further, because it can make no difference to the outcome of this appeal. *See* TEX. R. APP. P. 47.1 (requiring the appellate court to address "every issue raised and necessary to final disposition of the appeal"). The trial court already has acted on the finding by referring the matter to the Office of the Chief Disciplinary Counsel, and the question of whether Yetiv violated a disciplinary rule will be addressed through the grievance process. Yetiv cites no authority in which a court held that a judge abused his or her discretion by referring an *alleged* rule violation to the Office of the Chief Disciplinary Counsel. He also cites no authority that this court could rescind another court's referral of such a matter.

We overrule each of the issues presented in Yetiv's appeal, and affirm the trial court's sanctions orders.

## V. CONCLUSION

We conclude that Westview has not shown that any of the trial court's rulings were erroneous or that the jury's failure to find any basis for liability is against the great weight of the evidence. We further conclude that the trial court did not abuse its discretion in sanctioning Yetiv. We accordingly affirm the trial court's judgment.


/s/     Tracy Christopher
        Justice



Panel consists of Justices Boyce, Christopher, and Jamison.