**Affirmed and Opinion filed August 28, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00517-CV

---

### JOSEPH PRESSIL, Appellant

### V.

### JASON A. GIBSON AND JASON A. GIBSON, P.C. D/B/A THE GIBSON LAW FIRM, Appellees

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-51350**

---

## O P I N I O N

In this breach-of-fiduciary-duty case, plaintiff Joseph Pressil sued his former attorney and the attorney's law firm, alleging that the publicity the attorney garnered for Pressil's underlying health-care-liability claim caused Pressil to suffer mental anguish and to lose a potentially lucrative employment opportunity. After finding that Pressil fabricated evidence in support of his economic damages, the trial court

struck Pressil's pleadings and rendered a take-nothing judgment against him.  We affirm.

## I. BACKGROUND

About four years after his twin sons were born, Pressil discovered a 2007 receipt from a medical laboratory for cryopreservation of a sperm sample.  Although Pressil had not sought such services, the receipt listed Pressil as the patient.  On further investigation, Pressil learned that the lab is associated with a fertility clinic, and that Pressil's former girlfriend had conceived the twins through in vitro fertilization.

## A. The Fertility Lawsuit

Pressil contacted attorney Jason A. Gibson at the Gibson Law Firm (collectively, "Gibson") in early November 2011 to represent him in suing the clinic for performing the fertilization procedure without Pressil's knowledge or consent.  We refer to that case as "the Fertility Lawsuit."  According to Pressil, Gibson knew that the claims against the clinic were devoid of merit, but that the facts of the case would garner media attention.  Pressil contends that Gibson coerced him into giving interviews with various news outlets by telling Pressil that the publicity would force the clinic to settle the case.  Pressil states that Gibson also disclosed confidential information without Pressil's consent and sometimes in contravention of Pressil's express instructions.  He alleges that Gibson's disclosure of confidential information to the press and the resultant "extensive media blitz" caused Pressil to lose an employment opportunity and to suffer mental anguish and emotional distress.

The fertility clinic did not settle with Pressil, and Pressil's claims were dismissed with prejudice for failure to provide an expert report.

**B.      The Professional-Negligence Lawsuit**

After the Fertility Lawsuit was dismissed, Pressil sued Gibson and two other attorneys of the Gibson Law Firm for professional negligence, gross negligence, and breach of fiduciary duty.  *See Pressil v. Gibson*, 477 S.W.3d 402, 405–06 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("*Pressil I*").  The trial court rendered summary judgment against Pressil on his negligence claims on the ground, among others, that Pressil sustained no recoverable damages.  The trial court then severed the breach-of-fiduciary-duty claim from the negligence suit, *see id.* at 405, 408, and Pressil unsuccessfully appealed the summary judgment against him on his negligence claims.  *See id.* at 411.

**C.      The Breach-of-Fiduciary-Duty Lawsuit**

The present case is the breach-of-fiduciary-duty claim that was severed from the professional-negligence lawsuit.

Pressil alleges that in November 2011, he had applied and interviewed for a position as project manager for Genrus Corp., Inc., but that the negative publicity from the Fertility Lawsuit caused Genrus to withdraw Pressil from consideration. He pleaded that these pecuniary losses were between $500,000 and $1,000,000.  He additionally sought mental-anguish and exemplary damages.

**D.      The Sanctions**

Pressil's claim for economic damages centers on three documents attributed to Pressil or to Genrus employee Nigel Marcellin, and to Pressil's and Marcellin's sworn statements and testimony about the documents and the representations they contain.  These documents form the core of Pressil's claim that Gibson's actions in publicizing the facts of the Fertility Lawsuit cost Pressil a job as a project manager at Genrus where Pressil would have earned $2,500 per week.

3

The trial court found that one of the documents was fabricated, and that Pressil's attempt to explain away the fabrication—particularly when coupled with a second document—"def[ied] credibility." The trial court concluded that merely striking the evidence would be an insufficient sanction, because that would deprive Gibson of the opportunity to use the fabricated evidence to impeach Pressil's credibility and would simply restore Pressil to the same position he would have occupied had he not fabricated evidence in the first place. The trial court therefore struck Pressil's pleadings and rendered a take-nothing judgment against him.

On appeal, Pressil argues that the trial court abused its discretion in imposing death-penalty sanctions because (1) there was no evidence or finding that the evidence was intentionally fabricated for the purposes of litigation rather than recreated for a legitimate purpose, (2) the trial court failed to adequately consider lesser sanctions that would have sufficed, and (3) the fabricated document was unrelated to the core elements of Pressil's breach-of-fiduciary-duty claim.[1]

## II. SANCTIONS STANDARDS

We review a sanctions order for abuse of discretion. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam). A trial court abuses its discretion if the sanction is not supported by some evidence or is contrary to the only permissible view of properly admitted, probative evidence. *See id.* (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding)). In the sanctions context, the trial court is the factfinder and determines the witnesses' credibility and the weight to be given to their testimony. *See Davis v. Farias Enters. Ltd.*, No. 14-14-00016-CV, 2015 WL 509514, *3 (Tex. App.—San Antonio Feb. 4, 2015, no pet.) (mem. op.); *Westview Drive Invs., LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583,

---

[1] We have reordered Pressil's issues.

615 (Tex. App.—Houston [14th Dist.] 2017, pets. denied) (citing *Sterns v. Martens*, 476 S.W.3d 541, 556 (Tex. App.—Houston [14th Dist.] 2015, no pet.)). We will reverse the sanctions order only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Unifund*, 299 S.W.3d at 97. If the trial court does not make formal findings, we may consider the factual findings stated in the trial court's order or judgment. *See Mumma v. Aguirre*, 364 S.W.2d 220, 221 (Tex. 1963); *Monroe v. Grider*, 884 S.W.2d 811, 816 (Tex. App.—Dallas 1994, writ denied). We are not bound in our analysis by the trial court's findings of fact and conclusions of law, and we instead independently review the entire record to determine whether the trial court abused its discretion. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam).

The rules governing discovery sanctions specify that such sanctions must be just. TEX. R. CIV. P. 215.2(b)(2); TEX. R. CIV. P. 213. A sanction is "just" if there is a direct relationship between the offensive conduct and the sanction, and the sanction is not excessive. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding).

The direct-relationship requirement is satisfied if the sanction is directed (1) against the abuse; (2) toward remedying the prejudice caused to the innocent party; and (3) against the offender, whether that be a party, counsel, or both. *Id.*

Regarding excessiveness, a discovery sanction should be no more severe than necessary to satisfy one of its legitimate purposes. *Id.* at 914–18. Those purposes are (1) to secure the parties' compliance with the discovery rules, (2) to deter other litigants from violating the discovery rules, (3) to punish violators, and (4) to compensate the aggrieved party for expenses incurred. *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016) (purpose 4); *Bodnow Corp. v.*

5

*City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986) (per curiam) (purposes 1–3). Courts therefore must consider whether any available lesser sanctions, individually or in combination, would serve these ends. *See TransAmerican*, 811 S.W.2d at 918. In all but the most egregious and exceptional cases, a trial court must impose lesser sanctions before resorting to case-determinative ones. *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004). Case-determinative discovery sanctions should not be used unless the misconduct justifies a presumption that the party's claims or defenses lack merit. *TransAmerican*, 811 S.W.3d at 918. To guard against excessive sanctions, the trial court must offer a reasoned explanation for the sanction imposed. *Cire*, 134 S.W.3d at 840.

### III. PRESSIL'S SANCTIONABLE CONDUCT

In his first issue, Pressil asserts that there is no evidence or finding that a document was intentionally fabricated for purposes of litigation rather than recreated for a legitimate purpose. We disagree. The trial court sanctioned Pressil for "manufacturing evidence related to damages," and the evidence supports that finding.

Pressil's claim for economic damages relies on three documents. The first document is "the Pressil Letter," which is represented to be a letter from Pressil applying for a position with Genrus as a project manager. It is unsigned, undated, and unaddressed. The second document is "the Marcellin Letter," which is purported to be a letter from Nigel Marcellin at Genrus informing Pressil that he will not be considered for a position "due to [the] high level of publicity exhibited through various media publications regarding yourself." It is unsigned and unaddressed. The third document is a completed federal employment-eligibility verification form known as "Form I-9." The form must be signed under penalty of perjury by both the employee and the employer's authorized representative. Pressil

6

and Marcellin each signed the Form I-9 produced in this case, and each dated the document November 17, 2011. Although the trial court sanctioned Pressil only for manufacturing Form I-9, the trial court found that both Form I-9 and the Marcellin Letter "defy credibility."

## A. The Evidence Regarding Form I-9

As Gibson pointed out in the trial court, the federal government provides instructions on the use of Form I-9 on the U.S. Citizen and Immigration Services webpage, "Which Form I-9 Should I Use?"[2] There it is stated, "To determine whether you are using the correct version of Form I-9, look at the revision date printed on the bottom left corner of the form . . . ."

At his deposition, Pressil was shown the signed Form I-9. He agreed that

- the signed document is the form he completed when Marcellin interviewed him at Genrus;

- the interview took place on November 17, 2011;

- the form is dated November 17, 2011;

- the date is written in Pressil's handwriting;

- he has not seen the document since he completed it in November 2011;

- he did not "go back and create this document later"; and

- if the document "wasn't actually written in 2011 but it was created [at] some point after that time, then this entry is false."

Gibson's counsel then drew Pressil's attention to the bottom left corner of the Form I-9. The revision date printed there is "03/08/13."

---

2 https://www.uscis.gov/i-9-central/complete-correct-form-i-9/which-form-i-9-should-i-use, (last visited August 22, 2018).

Pressil agreed that the signed Form I-9 is a 2013 version of the form. When asked at his deposition to explain how he came to write a 2011 date on a 2013 form, Pressil answered, "I don't know." Gibson's counsel posed different variations of the question, and Pressil testified at least four times that he did not know how to explain how he came to write a 2011 date on a form that was not created until 2013.

After Gibson moved for sanctions, however, Pressil found that he did know how to explain it. He submitted a declaration under penalty of perjury in which he stated,

> [S]ometime in 2013, I was at a job site working as a construction manager for another company. Genrus was one of the contractors working on the job site at that time. One of the project managers employed by Genrus approached me and handed me another I-9 form to fill out. I do not remember his name. I was instructed to use the same date as the original I-9 form I filled out during my interview in November of 2011 to accurately reflect the original document which was apparently lost by Genrus. The questions being asked to me in the deposition concerning the I-9 form were confusing and argumentative. I tried to explain myself the best I could but apparently the testimony was unclear. To be clear, I have not forged or fabricated any documents in this case. And, I have not given any false testimony in this case.

Other evidence, however, cannot be reconciled with this version of events. Pressil stated that he does not remember who approached him at the job site in 2013, and Marcellin similarly testified that he does not remember who this person was, but the form itself identifies Marcellin as the person who reviewed the driver's license that Pressil produced to prove his statement in the form that he is a United States citizen. In the form, Marcellin also identified his title as "project manager," but by 2013 Marcellin's title was "president." Fourth, Marcellin wrote on the form Genrus's address in Jamaica, New York. Although that was Genrus's address in 2011, the company relocated to St. Albans in 2012. The Form I-9 was manifestly intended to be passed off as having been completed in 2011.

8

In his deposition, Marcellin attempted to explain these facts. According to Marcellin, Pressil completed the Form I-9 at his job interview in November 2011, but the form was lost when Genrus moved its offices in 2012. Marcellin claimed that he instructed Genrus's staff to go through all of the files and recreate missing documents. He stated that he "wanted to keep a record of all employees or prospective employees, in the event anything were to change in the future, I could always have a conduit through either them or their network." But if Marcellin merely wanted to ensure he could contact Pressil in the future, he would have asked for Pressil's information as of 2013, not as of November 2011. Moreover, there would have been no need for Marcellin to backdate the document, to provide an inaccurate address for Genrus, or to identify himself by a superseded job title—all under penalty of perjury. Further still, when Marcellin produced the Form I-9 in response to a deposition on written questions, he attested that the record was made "at or near the time of the act, event, or condition recorded, or reasonably soon thereafter." That attestation is inconsistent with his later deposition testimony and with Pressil's declaration that the form dated 2011 was completed in 2013.

Even Pressil's counsel agreed with the trial court that the version of events in which Pressil was asked to complete the Form I-9 at a job site in 2013 "doesn't make sense."

**B.    The Marcellin Letter**

In considering whether to sanction Pressil, the trial court relied not only on the Form I-9, but also on the unsigned, unaddressed Marcellin Letter. The most pertinent part of the Marcellin Letter is the following passage:

> Although we view you as a viable candidate for this position being offered which as discussed, carries a weekly salary of $2,500.00/week, unfortunately due to [the] high level of publicity exhibited through various media publications regarding yourself which was disclosed by

our HR department, and the high profile nature of the apparent situation(s) at hand, we regret to inform you we are unable to further pursue the employment screening and interview process which has already commenced.

Although the letter is dated December 1, 2011, it is printed on Genrus's letterhead—which includes Genrus's post-2012 address in St. Albans, New York, rather than its 2011 address in Jamaica, New York. In his deposition, Marcellin attempted to explain the discrepancy with the same explanation rejected by the trial court in connection with the Form I-9, that is, he claimed that the letterhead was changed as part of "updating the files." But as with the Form I-9, the Marcellin Letter's form—the letterhead—was created after the date placed on the document.

## C.    The Trial Court's Assessment of the Evidence

According to Pressil, "The allegedly fabricated document, the I-9 employment form, was recreated from an original for a legitimate purpose unrelated to litigation. *The trial court recognized this fact, considered it as true and admitted that no fraud had occurred.*"[3]

The italicized sentence is a gross misrepresentation of the record. In the page of the record Pressil cites as support for this statement, the trial court was not making findings of fact or conclusions of law; it was summarizing *Pressil's* version of events. The trial court said, "[W]hat he said was, But I—I also did one in 2011. It's not—fraud per s[e], because I'm just recreating a document that existed before and something." The trial court stated at the outset of the sanctions hearing that "for the purposes of our conversation here," the trial court would take Pressil at his word as to the occurrence of events, but "that's still pretty bad behavior."

The trial court in its order, however, viewed the evidence thusly:

---

[3] Appellant's Br. at 19.

Plaintiff offers no credible reason, and none comes to mind, why a company which had turned him down two years prior would care to re-create an I-9 form, or would even notice that it was gone, or how it would remember Plaintiff specifically to then somehow go find him. Nor does Plaintiff state why he would so willing[ly] agree to provide some stranger who walked up to him at a job site with his Social Security number and other identifying information as he recreated the lost I-9. The Court's discomfort with the scenario painted by Plaintiff is compounded when considering Plaintiff's proffer of an unsigned letter from Genrus in which Plaintiff's job application is declined, then oddly lays out the salary he would have received had he been employed and conveniently identifies Defendants' conduct as leading to the decision not to employ. *The circumstances, as a whole, defy credibility*.[4]

This Court makes no finding, and is not required to determine, whether Plaintiff really had filled out an I-9 back in 2011. The Court is responding to the admission that the I-9 present in this case is a post-event fabrication which was passed off by Plaintiff as genuine until he got caught.

The trial court did not find that Pressil "recreated" the I-9, it found that Pressil "manufactured" it.

The trial court did not "admit that no fraud had occurred"; to the contrary, the trial court stated in the sanctions order that "no lesser sanction is entered because any lesser sanction simply leaves Plaintiff where he was *had he not attempted this fraud*."[5] The trial court further explained that striking "all evidence related to the job application at Genrus[] would deprive Defendant of the opportunity to use the manufactured I-9 *as a means of exposing Plaintiff's fraud*."[6]

---

[4] Emphasis added.

[5] Emphasis added.

[6] Emphasis added.

The trial court did not fail to find "that a document was intentionally fabricated for purposes of litigation." The trial court found that Pressil was "caught manufacturing evidence related to damages."

The evidence we have recounted amply supports these findings. Although Pressil's appellate argument assumes that the trial court did, or must, accept his explanation for the back-dated document, the trial court was well within its discretion in finding that the documents on which Pressil relied and the explanations offered for their discrepancies "defy credibility."

We overrule Pressil's first issue, and we hold that the trial court did not abuse its discretion in determining that Pressil's conduct merited sanctions.

## IV. APPROPRIATENESS OF DEATH-PENALTY SANCTIONS

Pressil's second and third issues both are directed to the propriety of death-penalty sanctions for his misconduct. He contends that the sanctions of striking his pleadings and rendering a take-nothing judgment against him are excessive because (a) the trial court failed to adequately consider lesser sanctions and to offer a reasoned explanation for the sanction imposed, and (b) the fabricated evidence is not related to the "core elements" of his claim.

### A. The Trial Court's Consideration of Lesser Sanctions and Reasoned Explanation for Death-Penalty Sanctions

The trial court stated in its sanctions order that, in arriving at the appropriate response, the case it found particularly persuasive was *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 235 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (op. on reh'g en banc). Like this case, *Daniel* involved fabrication of evidence. *See id.* at 234.

In *Daniel*, plaintiff Reba Daniel sued her employer for sexual harassment, discrimination, and retaliation. *Id.* at 231. In support of her claims, Daniel had

audiotaped a conversation between herself and David Kelley, *see id.*, but the tape recording she produced had been altered. *Id.* at 234. The trial court sanctioned Daniel by striking her pleadings and rendering a take-nothing judgment against her, and the appellate court affirmed the judgment. *Id.* at 235–36.

In rejecting Daniel's appellate argument that lesser sanctions were available, the First Court of Appeals stated as follows:

> Exclusion of the tape would have been ineffective as punishment. True, it would have deprived her of evidence authenticating her claim. But exclusion would merely have placed her in the same position she had been in before she manufactured the tape. And she was still left with her own testimony and two other confirming tape recorded conversations with third parties. Moreover, appellees might have wanted to introduce the tainted tape in order to impeach the very fabric of Daniel's veracity. The more punitive sanction of refusing to allow Daniel to testify would have had essentially the same consequence as the one about which she complains: she could not have established her case without her own testimony.
>
> One of the purposes of discovery sanctions is to punish those who violate the rules of discovery. . . . An act so destructive of the integrity of our judicial process, such as the fabrication of physical evidence, deserves serious punishment. Such intentionally egregious behavior warrants punishment that places the guilty party in a worse position than that from which she began.

*Id.* at 235.

The *Daniel* court further explained that "[t]he very act of fabricating evidence strongly suggests that a party has no legitimate evidence to support her claims. Clearly, a presumption arises therefrom that her claims have no merit. Meritless claims impose a terrible hardship on opponents, and it is unjust to allow such claims to be presented." *Id.*

In reviewing the death-penalty sanctions in *Daniel*, our sister court stated that the case was controlled by its own precedent in *Vaughn v. Texas Employment*

13

*Commission*, 792 S.W.2d 139 (Tex. App.—Houston [1st Dist.] 1990, no writ.). *See Daniel*, 981 S.W.2d at 235–36. In *Vaughn*, Zelda Vaughn sued her former employer and former supervisors for wrongful termination and defamation; she also sued the Texas Employment Commission ("TEC") for wrongful denial of unemployment benefits, and the trial court severed her claim against the TEC into a separate action. *See Vaughn*, 792 S.W.2d at 140. In support of her defamation claim in the remaining action, Vaughn produced three documents she claimed were transcripts of phone calls between prospective employers and her former employer. One document was said to be a transcript between prospective employer Jean Cox and Vaughn's former supervisor. *See id.* at 141. In her deposition, Vaughn testified that Cox had agreed to make the recording and that Vaughn was not present when the call was recorded. *Id.*

The defendants' counsel revealed that they had contacted Cox, who denied having made such a call, and Vaughn eventually admitted that she had called the supervisor herself and falsely identified herself as Cox. *Id.* at 141 & n.1. After opposing counsel moved for sanctions, Vaughn filed "Retractions and Corrections of Deposition Testimony." *Id.* at 141. Nevertheless, she continued to insist that she had not lied about the transcript during her deposition and that she had used Cox's name "inadvertently." *Id.*

After hearing the evidence, the trial court, on its own motion, consolidated Vaughn's suit against the TEC back into her suit against the remaining defendants before dismissing the case in its entirety. *Id.* at 142. In affirming the judgment, the First Court of Appeals stated that "[t]he trial court obviously—and reasonably—concluded that Vaughn made these statements with the intent to deceive appellees." *Id.* at 143. Regarding Vaughn's assertions that she had not lied in her deposition but had used Cox's name inadvertently, the reviewing court characterized these

assertions as an unsuccessful attempt "to obfuscate the purposes and implications of her action." *Id.* Although Vaughn belatedly tried to retract her false deposition testimony, the appellate court held that "the trial court could reasonably have believed that these changes would not have been made if appellees' counsel had not discovered her fabrication." *Id.*

Vaughn also argued that her false statements pertained only to her defamation claim, and thus, the trial court abused its discretion in dismissing all of her claims against all defendants, including her previously-severed claims against the TEC. *See id.* at 143–44. The appellate court disagreed and pointed out that, in addition to fabricating evidence and lying about it in her deposition, Vaughn's perjury in claiming that she "inadvertently" used Cox's name "was a continuation of her earlier perjury [in her deposition]." *Id.* at 144.

The trial court's order in today's case demonstrates that the trial court considered and rejected lesser sanctions under the same reasoning of *Daniel* and *Vaughn*. In its sanctions order, the trial court wrote,

> During various appearances in this case, the Court has inquired of the Plaintiff about apparent deficiencies in proving up damages. It is therefore particularly noticeable and troublesome when Plaintiff gets caught manufacturing evidence related to damages. As observed in *Daniel v. Kelley Oil Corporation*, 987 S.W.2d 230, 235 (Tex. App.— Houston [1st] 1998), "[t]he very act of fabricating evidence strongly suggests that a party has no legitimate evidence to support [his] claims."
>
> . . . .
>
> Since it is admitted that Plaintiff manufactured the I-9, the Court must respond in some way to preserve the integrity of the court and the system as a whole. . . . The Court is also guided by the particularly persuasive reasoning found in [*Daniel*] which makes the point that simply removing the offending evidence accomplishes nothing more than placing the offending party back where he was had there been no

15

effort to defraud the system. Such a sanction removes the offending evidence but reflects no level of punishment.

. . . .

The Court notes in particular that no lesser sanction is entered because any lesser sanction simply leaves Plaintiff where he was had he not attempted this fraud. Further, merely striking this evidence, or more broadly all evidence relating to the job application at Genrus, would deprive Defendant of the opportunity to use the manufactured I-9 as a means of exposing Plaintiff's fraud.

Accordingly, the only appropriate sanction is striking Plaintiff's pleading.

The sanctions order itself shows both that the trial court considered lesser sanctions and that the trial court gave a reasoned explanation for death-penalty sanctions. In addition, the transcript of the sanctions hearing shows that Pressil's counsel stated that "to strike everything about the employment basically does the same thing [as striking pleadings]." The trial court responded, "That's the thing. It's so dispositive, because this is his one area of damage, isn't it?" Pressil's attorney agreed that it was. *Cf. Butan Valley, N.V. v. Smith*, 921 S.W.2d 822, 827 (Tex. App.—Houston [14th Dist.] 1996, no writ) (pointing out that when reviewing death-penalty sanctions for abuse of discretion, we also consider the arguments of counsel).

Although the trial court gave specific reasons for concluding that lesser sanctions were insufficient and death-penalty sanctions were required, Pressil contends that the trial court's explanation is conclusory. We disagree. Courts have found a trial court's reasons for rejecting lesser sanctions and imposing death-penalty sanctions conclusory where the trial court simply states, without any explanation, that lesser sanctions would have been ineffective or would not promote compliance. *See, e.g.*, *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993) (orig. proceeding) (trial court "stated that lesser sanctions would have been ineffective, but the court did not explain why, and the record does not indicate

16

why"); *Associated Air Ctr. LP v. Tary Network Ltd.*, No. 05-13-00685-CV, 2015 WL 970664, at *3 (Tex. App.—Dallas Mar. 4, 2015, no pet.) (mem. op.) (unexplained statement that "lesser sanctions would not promote compliance with the Texas Rules of Civil Procedure" is conclusory); *In re Estate of Perez-Muzza*, 446 S.W.3d 415, 425 (Tex. App.—San Antonio 2014, pet. denied) (no deference given to conclusory statement that "no lesser sanction that [sic] dismissal with prejudice would be sufficient to deter, alleviate, and counteract the bad faith abuse of the judicial process and the interference with core judicial functions that [Veronica] committed in this case"). In contrast, the trial court in this case listed some of the lesser sanctions it considered and specific reasons for concluding that the lesser sanctions would not punish Pressil or would deprive Gibson of evidence of Pressil's lack of credibility.

We overrule this issue.

## B.     Relationship to "Core Elements" of Pressil's Claim

Pressil further contends that death-penalty sanctions are excessive because the manufactured evidence does not relate to a "core element" of his claims. Specifically, he contends that it would have been sufficient for the trial court to exclude the Form I-9, or even to exclude his claim for the alleged lost employment opportunity, but that he should have been allowed to proceed with his claim for mental-anguish damages. We disagree.

This court has adopted the reasoning in *Daniel*. *See In re RH White Oak, LLC*, No. 14-15-00789-CV, 2016 WL 3213411, at *8 (Tex. App.—Houston [14th Dist.] June 9, 2016, orig. proceeding [mand. denied]) (mem. op. on reh'g). As previously explained, *Daniel* was governed by *Vaughn*, and in *Vaughn*, the fabricated evidence pertained only to the plaintiff's defamation claim, but our sister court affirmed death-penalty sanctions that encompassed not only Vaughn's defamation claim against her

17

former employer and former supervisors, but also her claim against the TEC for wrongful denial of unemployment benefits.  Although the fabricated evidence did not go to a "core element" of the claim against the TEC, the fabrication nevertheless gave rise to a presumption that the claims lacked merit.

Moreover, the trial court found that the manufactured evidence "was produced as part of [the] evidence that the Plaintiff applied for employment, but had been turned down due to the conduct of Defendants.  The I-9, along with related documents, are key to Plaintiff's case and central to his only real damages, if any."  As we have seen, Pressil's counsel argued that excluding evidence of the alleged lost employment opportunity would be a death-penalty sanction because it was Pressil's only basis for damages.  Thus, the record supports the trial court's finding that the employment documents are key to Pressil's case.

The cases on which Pressil relies are also factually distinguishable.  For example, Pressil relies on *Fletcher v. Blair*, 874 S.W.2d 83 (Tex. App.—Austin 1994, writ denied), in which the Third Court of Appeals reversed death-penalty sanctions and stated that it is inappropriate "to extinguish a party's entire cause of action when the party makes a false statement about matters unrelated to the core elements of that cause." *Id.* at 86.  That case did not involve fabrication of physical evidence, as in the case before us.  In *Fletcher*, the plaintiff was involved in an auto accident in which she allegedly was injured.  To increase her damages, she made false statements about her past income and her level of education. *See id.* at 85.  The reviewing court concluded that her false statements did not justify a presumption that her entire claim lacked merit, because "even if the false statements could be said to diminish Fletcher's credibility generally, and so taint her proof of *subjective* medical injuries such as dizziness and irritability, nonetheless any diminution of her

18

credibility should not color her evidence of *objective* injuries such as broken teeth." *Id* .at 85–86.

Here, the opposite is true. Logically, Pressil's fabrication of evidence of objective damages justifies a presumption that his claims of subjective injuries also lack merit.

Pressil additionally relies on *Kim v. Hendrickson*, No. 05-13-01024-CV, 2015 WL 3898219 (Tex. App.—Dallas June 25, 2015, pet. denied) (mem. op.), in which the Dallas Court of Appeals reversed death-penalty sanctions imposed for fabricating evidence. In that case, Kim had contracted to buy a residential property from Hendrickson, and Hendrickson unsuccessfully sued Kim to have the contract set aside. *Id.* at *1. The trial court ordered specific enforcement and awarded Kim $15,000 in attorneys' fees. *Id.* When Hendrickson again sued Kim, alleging that she had defaulted on the payments for the property, Kim counterclaimed for the costs of maintaining the property. *Id.* In addition, she asked the trial court to apply Hendrickson's liability for her attorneys' fees in the earlier suit as an offset against any amount she owed for the property. *See id.* After a mistrial, both sides moved for death-penalty sanctions: Kim had fabricated an invoice in support of her claim for damages for the costs of maintenance, and Hendrickson had lied under oath. The trial court granted both motions. *See id.* at *2–3.

On appeal, Kim argued that the trial court did not adequately consider lesser sanctions and that death-penalty sanctions were arbitrary and unreasonable. *Id.* at *4. The reviewing court agreed with both contentions. *See id.* at *5. The record did not reflect that the trial court had considered lesser sanctions. *Id.* Although the trial court had stated that Kim's misconduct "went to the heart of the merits of the case," the reviewing court held that the fabricated evidence was unrelated to Kim's claim for an offset. *See id.* Because the claim for an offset was based on a judgment

19

rendered against Hendrick several years earlier, Hendrickson's liability for the fees already was established. Kim's fabrication of evidence regarding the cost of maintaining the property did not justify a presumption that an offset based on an existing final judgment lacked merit. *Cf. also Baker v. Baker*, 469 S.W.3d 269, 272, 278 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (death-penalty sanctions for failure to provide method of calculating damages was excessive where it is undisputed that father punched mother in the face and mother produced her medical bills); *Knoderer v. State Farm Lloyds*, No. 06-13-00027-CV, 2014 WL 4699136, at *11 (Tex. App.—Texarkana Sept. 19, 2014, no pet.) (mem. op.) (death-penalty sanctions excessive where "compelling," untainted evidence from disinterested witnesses supported plaintiffs' claim).

Unlike the cases Pressil cites, the presumption that Pressil's claims lack merit was not rebutted by proof of objective injuries or damages or by an admission of tortious conduct. Pressil's fabricated evidence pertained to his claim for damages from a lost employment opportunity, and no other objective damages were alleged. His requests for mental-anguish or emotional-distress damages are based on his alleged subjective injuries requiring his testimony. The trial court acted within its discretion in concluding that merely striking Pressil's claim for the alleged lost employment opportunity was an insufficient sanction because doing so would allow Pressil to testify to subjective harm without allowing his opponents to expose his prior fabrication of evidence.

Pressil also cites *In the Estate of Perez-Muzza*, 446 S.W.3d 415, 425 (Tex. App.—San Antonio 2014, pet. denied) for the proposition that false statements on collateral issues do not warrant death-penalty sanctions. In that case, Veronica Peña contested a will and signed an affidavit denying that she had received any of the decedent's jewelry. *Perez-Muzza*, 446 S.W.3d at 418. She later admitted in a

deposition that the executor had given some jewelry to a relative, and the relative had given a piece of the jewelry to Peña. *Id.* The trial court dismissed the case (a) on the ground that Peña's acceptance of the jewelry estopped her from contesting the will, and (b) as a sanction for providing false testimony on the estoppel issue. *See id.* at 419, 425. The reviewing court held that, as a matter of law, Peña's receipt of the jewelry under the circumstances described did not estop her from contesting the will, and thus, her false denial of having received any jewelry "had no bearing on any material issue before the trial court." *See id.* at 425. Thus, Peña's false statements made to avoid estoppel did not justify a presumption that her claims lacked merit, because as a matter of law, estoppel did not apply. Here, however, Pressil's alleged damages were an essential element of his claim, not a collateral matter to be decided as a question of law.

Pressil additionally relies on *In re First Transit Inc.*, 499 S.W.3d 584 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding [mand. denied]), in which we directed the trial court to vacate its sanctions order and consider lesser sanctions. *Id.* at 598. In that case arising from a complex traffic accident involving five vehicles and seven collisions, a bus struck and killed a man. *Id.* at 588. As a death-penalty sanction for failing to timely produce evidence, the trial court excluded the bus company's accident-reconstruction expert from testifying. *Id.* at 591. The trial court did not consider lesser sanctions or offer a reasoned explanation for death-penalty sanctions, *id.* at 595, and as to one possible ground for sanctions, the bus company was not given notice and an opportunity to be heard. *Id.* at 596. As another suggested ground for sanctions, the plaintiff's counsel pointed out that the bus company had removed and misplaced the bus's video camera. *See id.* We stated that the sanction could not be upheld on this basis because the trial court made no finding of spoliation and because there was not a direct relationship between the loss

of the camera and the exclusion of all testimony from the bus company's expert witness. *Id.* at 596–97.

Unlike in *First Transit*, there is a direct relationship between Pressil's fabrication of evidence and the death-penalty sanctions imposed. Pressil manufactured evidence in support of his claimed loss of an employment opportunity, and his counsel acknowledged that those damages were central to the case.

For all of these reasons, we overrule Pressil's remaining issue.

## V. CONCLUSION

Finding no abuse of discretion, we affirm the trial court's judgment.

/s/    Tracy Christopher
       Justice

Panel consists of Chief Justice Frost and Justices Christopher and Jamison.